THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR VELEZ, Defendant-Appellant.

First District (3rd Division)   No. 1—06—0912

Opinion filed February 4, 2009.

494

Steven A. Greenberg, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Michelle Katz, and Matthew Connors, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURPHY delivered the opinion of the court:

Following a jury trial, defendant, Victor Velez, was convicted of first degree murder and sentenced to 45 years' imprisonment. On appeal, defendant contends that: (1) his counsel was ineffective for withdrawing a motion to suppress his statement and for failing to file a motion to quash his illegal arrest; (2) he was denied his right to a fair trial when the State impermissibly introduced testimony, in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), regarding his refusal to speak to the police after invoking his right to counsel; (3) the trial court erred in allowing admission of gang-related evidence; (4) the cumulative errors deprived him of his right to a fair trial; (5) the evidence was insufficient to prove him guilty beyond a reasonable doubt on a theory of accountability; and (6) his sentence was excessive.

The facts adduced at trial demonstrated that, on December 29,

2003, defendant accompanied his armed codefendant, Jesus Vega,[1] to a bar in a "hot" neighborhood in order to retrieve money from the victim, Jose Soto. At some point in route, codefendant informed defendant that he intended to shoot the victim if the victim did not produce the money. Codefendant then provided defendant with a cellular telephone in case something went awry, instructing him to act as a lookout and to alert codefendant if the police arrived on the scene. When the victim subsequently appeared outside the bar's entrance, codefendant approached and shot him several times. Codefendant then fled the scene; however, defendant remained nearby until codefendant called him and confirmed that codefendant shot the victim.

Prior to trial, defense counsel filed a "Motion to Suppress Statements Made During Improper Interrogation," maintaining that the police violated defendant's fourth and fifth amendment rights. At the subsequent hearing, Detective John Day testified that, on January 9, 2004, he and his partner, Detective Thomas Kolman, were investigating the victim's murder when they learned that defendant had been brought to the police station. At approximately 8:30 p.m., Detectives Day and Kolman entered the unlocked interview room where defendant had been waiting for approximately 15 minutes. According to Detective Day, defendant was not under arrest at the time: he was not wearing any handcuffs; had not been photographed; and had not been fingerprinted. Prior to starting the interview, Detective Day read defendant his *Miranda* rights, which defendant immediately waived. The first interview lasted between an hour and an hour and a half, during which time, according to Detective Day, defendant implicated himself in the underlying crime. In relevant part, defendant admitted that he acted as a lookout while his fellow gang member, codefendant, shot and killed the victim, who was also a fellow gang member.

Detective Day further provided that, after obtaining the statement, he requested that defendant take a polygraph examination. Defendant agreed despite the fact that the polygraph examiner was not available until the following morning. As a result, defendant remained at the police station overnight. In the interim, Assistant State's Attorney (ASA) James Papa arrived to interview defendant. After again being advised of his *Miranda* rights, defendant agreed to speak to ASA Papa in the presence of Detective Day. The interview lasted approximately 45 minutes, the contents of which were not memorialized. The police then provided defendant with a cot in the interview room plus a beverage and a bag of potato chips. Throughout

---

[1]Codefendant Vega is not a party to the instant appeal.

the time Detective Day spent with defendant on January 9, 2004, and the early morning hours of January 10, he did not recall defendant having requested an attorney or learning that an attorney called on defendant's behalf. When Detective Day concluded his shift and left the police station, defendant was not under arrest.

Detective Kolman testified at the hearing that he was back on duty during the afternoon of January 10, 2004. When he arrived at the police station, he learned that defendant had been placed under arrest at an unknown time and that defendant's attorney had arrived earlier in the day. Detective Kolman also learned that defendant had engaged his right to remain silent. Notwithstanding, at approximately 9:25 p.m., defendant knocked on the door of the interview room where he had remained and motioned to Detective Kolman. Detective Kolman subsequently opened the locked interview room door and asked defendant what he needed. Defendant responded that he wished to speak to him. Detective Kolman then asked defendant whether he had an attorney, and, if so, whether the attorney had advised defendant not to speak to the detectives. Defendant responded in the affirmative to both questions, thus Detective Kolman asked defendant whether he wished to speak to him despite those instructions. Defendant assented. As a result, Detective Kolman readvised defendant of his *Miranda* rights, which he waived. Following a conversation lasting approximately 15 minutes, defendant requested to speak to an ASA.

Thereafter, the parties agreed to continue the hearing to accommodate defendant's witnesses; however, on the next scheduled date, defense counsel advised the court that he wished to withdraw the motion. In response, the court asked whether defense counsel had discussed the decision with defendant, and defense counsel replied that he had done so "in much detail." The court then admonished defendant as follows:

> "THE COURT: You understand, as I said, we've heard two witnesses on the motion and we're prepared to go forward with additional evidence, some evidence is here, but you're content with the decision, the advice of your attorney, to withdraw the motion at this time?
>
> DEFENDANT: Yes, your Honor.
>
> THE COURT: You understand that once it's withdrawn it's not going to be filed again and litigated again. Do you understand that?
>
> DEFENDANT: Yes.
>
> THE COURT: Nobody promised you anything to cause you to make that decision?
>
> DEFENDANT: No.
>
> THE COURT: Or threatened you?

DEFENDANT: No.

THE COURT: You're doing this of your on [sic] free will after consulting with your attorney; is that right?

DEFENDANT: Yes."

At trial,[2] defense counsel stated, in opening, that the court would provide the jury with an accountability instruction, which "will have in its context the need for specific intent, an item, an action, a forwarding motion." The State subsequently objected and the court advised defense counsel to refrain from argument during opening statements. Defense counsel continued by urging the jury to focus on the State's burden of proof and consider that defendant took no part in the victim's murder, noting that defendant "was not necessarily in the area" where it took place.

Edna Aguayo then testified that, at the time in question, she lived with her mother and brother approximately one block away from the intersection of Armitage and Karlov Avenues. Codefendant was her distant cousin and she had known defendant for some time because she was friends with his child's mother. Aguayo recalled that, on the night in question, codefendant and defendant arrived at her home requesting a dark, hooded sweatshirt, which her brother provided to codefendant. Approximately 15 minutes after the men left, Aguayo heard gunshots. As a result, Aguayo phoned her boyfriend. While speaking to him, she received another call, but could not recall from whom. Aguayo recalled being interviewed by Detective Vincent Viverito and his partner the day after the incident, but did not remember whether she told the detectives that the unidentified call was from defendant using codefendant's cellular phone. Aguayo, however, admitted that she identified defendant as the caller during her grand jury testimony.

On cross-examination, Aguayo further admitted that, prior to the night in question, she had never spoken to defendant on the telephone; however, Aguayo averred that she could recognize his voice at the time because she had spoken to him in person on many occasions when she was with his child's mother.

Detective Viverito testified that, on December 30, 2004, Aguayo arrived at the police station and was shown a photograph of defendant. According to Detective Viverito, Aguayo identified defendant as the individual with her cousin on the night in question. As a result of Aguayo's identification and his prior investigation, Detective Viverito stated that defendant was then considered a "person of interest."

Rosalee Soto, the victim's wife, testified that her husband and his

---

[2]A double jury trial was held for defendant and codefendant.

cousin, Angel Navarro, were at a bar near the intersection of Armitage and Karlov Avenues on the night in question. Around 10:30 p.m., Rosalee drove to the bar to bring something to the victim and then left to retrieve money for him from an automated teller machine. She returned at approximately 11 p.m.; however, Rosalee remained in her car while the victim exited the bar to obtain the money. Following a brief conversation, Rosalee watched her husband walk back toward the bar. When he reached the establishment's door, Rosalee heard a gunshot and saw that codefendant shot her husband from approximately four feet away. Rosalee's husband attempted to run to safety; however, codefendant followed him in the direction of Rosalee's car, then stopped and fired his handgun four or five more times at him. Rosalee testified that, at that time, she feared that codefendant would attempt to shoot her as well; therefore, she drove from the scene. She eventually found her husband, who climbed into her car. Then, while in route to a hospital, Rosalee was in an accident with another vehicle. The police and an ambulance arrived shortly thereafter and transported her husband to the hospital. Meanwhile, Rosalee provided the police with a description of the shooter. She later learned that her husband died from the gunshot wounds.

Rosalee further testified that, on January 10, 2004, the police arrived at her home and administered a photographic array. She did not identify her husband's offender at the time; however, Rosalee requested to view a lineup. Later that day, Rosalee went to the police station to view the lineup, at which time she positively identified codefendant as her husband's offender.

On cross-examination, Rosalee stated that she did not see anyone other than codefendant outside the bar when her husband was shot.

Navarro testified that he was inside the bar when he heard gunshots outside and took measures to protect himself. He emerged from the bar shortly thereafter and saw Rosalee driving the victim from the scene. Navarro followed Rosalee's car on his bicycle until Rosalee was in the accident. He then attempted to help the victim with his injuries.

On cross-examination, Navarro reported that he did not see defendant on the night in question, either before entering the bar or after exiting to attend to the victim.

ASA Jeannie Bischoff testified that she interviewed defendant on the evening of January 10, 2004, after she first spoke to the various detectives, Aguayo and Rosalee. Defendant agreed to speak to ASA Bischoff after being read his *Miranda* rights. Defendant chose to memorialize his statement in writing and it was published to the jury.

In his statement, defendant admitted that, on December 29, 2003,

he accompanied codefendant to Aguayo's house to obtain a sweatshirt. Thereafter, defendant asked codefendant why they remained in a "hot" neighborhood. Codefendant instructed defendant to "chill," revealing that he was armed with a handgun. Codefendant then asked defendant to join him on a walk and they quickly made their way to a bar near the intersection of Armitage and Karlov Avenues. Codefendant disclosed that he intended to retrieve money from an individual that was in the bar, adding that he intended to shoot the individual if the money was not repaid. Codefendant then gave defendant a cellular phone and further instructed defendant to "watch [codefendant's] back in case the police came and to call out 'yo' if defendant saw the police."

According to his statement, defendant stood across the street from the targeted bar on Armitage Avenue, while codefendant paced back and forth around the corner from the bar on Karlov Avenue for approximately 20 to 25 minutes before the victim appeared. Then, while the victim spoke to someone in a car, codefendant covertly moved closer to him. Eventually the victim and codefendant were face to face at which time codefendant shot him. The victim then attempted to run away, but codefendant fired another five or six gunshots at him. Thereafter, both the victim and codefendant fled. Defendant subsequently moved to a nearby location and waited for an additional 30 to 40 minutes. Defendant then used the cellular phone to call Aguayo's house in order to ascertain codefendant's whereabouts. Immediately thereafter, codefendant called defendant and instructed him to meet at a designated address. When defendant arrived, codefendant stated that he "aired dude out," meaning he shot the victim. Defendant then returned codefendant's cellular phone and went home.

At the conclusion of defendant's statement, he provided that "at the time of the shooting, he feared for his life because if he didn't watch out for [codefendant], the gang might do something real bad to him."

On cross-examination, ASA Bischoff admitted that defendant's attorney was not present when defendant gave his statement even though ASA Bischoff was aware that defendant had hired an attorney. ASA Bischoff additionally admitted that defendant's statement was not a verbatim recitation of her conversation with him.

At the close of the State's evidence, defense counsel motioned for a directed verdict; however, the motion was denied.

Detective Day testified for the defense that he never saw defendant leave the police station after initially arriving on January 9, 2004. Detective Day reiterated, however, that defendant agreed to spend the night at the police station.

In closing, defense counsel argued that defendant was never at the scene of the crime as demonstrated by the fact that none of the witnesses could identify him. Further, defense counsel emphasized inconsistencies in Aguayo's trial testimony compared to her grand jury testimony. Defense counsel specifically referenced the fact that Aguayo barely knew defendant and therefore could not accurately identify his voice on the night in question.

The jury found defendant guilty of first degree murder. Defendant subsequently hired a new attorney and filed a posttrial motion alleging, *inter alia*, ineffective assistance of trial counsel. Following a hearing during which extensive argument was allowed by both defendant's new counsel and the State, the trial court denied the motion. In so finding, the trial court determined that the *Strickland* prongs were not satisfied where defendant was not prejudiced by trial counsel's performance. Specifically, the court provided that defense counsel's performance was:

"not incomprehensible. It was not illogical. It was not gibberish-filled. He had a theory. He had an alternative theory and he argued alternatively to the jury. That's not always an easy thing to do, but it's a theory that nonetheless has been found to be viable by our reviewing courts. The fact that he was not successful does not mean that he was defective in any way. And it certainly does not mean that [defendant] was prejudiced by those strategic matters."

Thereafter, defendant was sentenced to 45 years' imprisonment. In fashioning its sentence, the court relied on the presentence investigation report and the arguments of counsel "within the framework of the [s]tatute that directs the Court to consider certain factors in aggravation and mitigation in imposing all sentences in criminal offenses." The court expressly provided that it considered the following: the facts of the case, in that defendant had knowledge of codefendant's intent yet agreed to act as the lookout; the need to deter others from committing a similar crime; defendant's criminal history, in that he had a number of juvenile convictions, including possession of narcotics and weapons offense, and an adult drug conviction for which he received probation shortly before the underlying offense; the fact that defendant had been a member of the Maniac Latin Disciples gang for five years despite the fact that he had an "unremarkable" childhood, in that his family was supportive, he attended school until his juvenile incarceration, had no dependancy issues and no discernable social or mental issues, and had a four-year-old child; defendant had no steady employment; the victim's manner of death, in that there was no "provocation, justification, excuse; [or] reasonable explanation for what occurred"; and the probability that defendant

would engage in future criminal activity. The trial court then denied defendant's motion to reconsider that sentence. This timely appeal followed.

Defendant first contends that his counsel was ineffective for failing to file a motion to quash his arrest and for abandoning his motion to suppress defendant's statement. The State responds that defendant has waived review of his claims. In the alternative, the State argues that the substance of defendant's claims does not warrant a new trial.

■ At the outset, we note that, in his brief, defendant heavily relies on police reports and a personal affidavit not admitted at trial. Defendant acknowledges that "ordinarily police reports would not be considered"; however, he encourages this court to consider the "facts" established by those documents, which he contends are properly before us because they were attached to his posttrial motion. We decline defendant's invitation and disagree that the documents are properly before us. Notably, in violation of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)), defendant fails to cite to any authority to support his proposition. Moreover, both documents were inadmissible hearsay evidence at the suppression hearing (see *Cranwill v. Donahue*, 132 Ill. App. 3d 873, 874 (1985)), and, therefore, neither document will be considered in addressing defendant's contentions.

We find the case cited by defendant, *People v. Negron*, 297 Ill. App. 3d 519 (1998), is distinguishable. In *Negron*, the court instructed that the affidavits attached to the defendant's brief, which allegedly supported his claim of ineffective assistance of counsel for failing to call named witnesses, were not properly before the court because, *inter alia*, they were not attached to the defendant's posttrial motion. *Negron*, 297 Ill. App. 3d at 537-38. Consequently, the *Negron* court concluded that the defendant's ineffective assistance claim was unsupported where there was no evidence illustrating the potential witnesses' testimony. *Negron*, 297 Ill. App. 3d at 537-38. In the case at bar, although defendant did attach the police reports and his personal affidavit to his posttrial motion, they remained improper additions to the record because they were inadmissible at the suppression hearing where Detectives Day and Kolman testified regarding the circumstances of defendant's arrest and defendant could have, but did not, testify on his own behalf.

■ We now turn to defendant's substantive contentions. In order to successfully assert a claim for ineffective assistance of counsel, a defendant must demonstrate that his counsel's representation fell below an objective standard of reasonableness and that his counsel's actions prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Counsel's

performance is presumed to be reasonable, and "strategic choices, made after investigating the law and the facts, are virtually unchallengeable." *People v. Griffin*, 178 Ill. 2d 65, 86 (1997). Moreover, to establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Griffin*, 178 Ill. 2d at 74. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. The defendant must satisfy both prongs of the *Strickland* test; however, the court need not review counsel's performance if the defendant fails to demonstrate resulting prejudice. *Griffin*, 178 Ill. 2d at 74; see *People v. Albanese*, 104 Ill. 2d 504, 527 (1984) (courts need not review a defendant's individual claims when "even assuming, *arguendo*, that all of the alleged errors constitute substandard representation, they would not have altered the result in [the] case").

The State initially argues that defendant is estopped from asserting his claims where his trial counsel withdrew the challenged motion, which, contrary to defendant's assertion, was inclusive of quashing defendant's alleged illegal arrest, and defendant, after being admonished, expressly agreed with its withdrawal. As a result, the State maintains that, pursuant to the doctrine of invited error, review of defendant's claim is barred. Defendant responds that this court should not apply the doctrine of invited error to the instant case because the decision whether to file the motion was trial counsel's and thus, by logical extension, it was also counsel's decision whether to withdraw the motion. Consequently, defendant did not invite the error where he simply agreed with counsel's advice and received no benefit from that concession.

The doctrine of invited error provides that "an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). The record clearly demonstrates, and defendant does not refute, that when asked whether he agreed with his counsel's decision to withdraw the motion, he acquiesced. The record further reveals that the court was careful to explicitly admonish defendant that withdrawal of the motion would bar it from ever being litigated, then or in the future. Nonetheless, defendant assured the court that he wished to withdraw the motion based on his own free will. Consequently, we are not persuaded by defendant's argument that the doctrine of invited error should not apply in this instance because he merely agreed with his counsel's advice. See *Morris v. Banterra Bank of Hamilton County*, 159 Ill. 2d 551, 552 (1994) ("the party inducing

the error must bear its consequences"). Defendant unequivocally knew the consequences of the request to withdraw the motion and agreed nonetheless. *Cf. People v. Bailey*, 375 Ill. App. 3d 1055, 1060 (2007) (the defendant's waiver of a motion to suppress his statement for fear of delaying trial did not encompass the challenged ineffective assistance claim for failing to file a motion to quash arrest and suppress subsequent physical evidence of which he was unaware).

Notwithstanding, waiver is a limitation on the parties and not the court (*Carter*, 208 Ill. 2d at 318); therefore, we review the merits of defendant's claim. Specifically, defendant argues that a motion to quash his arrest would have been successful at trial because he was arrested absent probable cause and the motion to suppress his statement would have been successful had it been fully litigated because his statement resulted from improper questioning after he invoked his rights to counsel and to remain silent. The State responds that neither motion would have been successful where defendant was not under arrest prior to giving his inculpatory statement and his statement resulted from defendant's own reinitiation of contact, thus waiving his fifth amendment rights.

Traditionally, the question of whether to file a motion to quash arrest or to suppress a statement is a matter of trial strategy best left to the discretionary judgment of trial counsel. *People v. Rodriguez*, 312 Ill. App. 3d 920, 925 (2000). As a result, courts will not engage in hindsight analysis to determine whether counsel's decision was reasonably adequate under the circumstances. *Rodriguez*, 312 Ill. App. 3d at 925. That said, in order to prevail on a claim of ineffective assistance for failing to file a motion to quash and suppress, a defendant must establish that the motion would have been granted and the trial outcome would have been different if the evidence had been suppressed. *Rodriguez*, 312 Ill. App. 3d at 925.

The parties dispute whether and when defendant was placed under arrest. The State maintains that, at the point defendant was brought to the police station, he was merely a person of interest and not under arrest. In opposition, defendant repeatedly asserts that he was under arrest when he was brought to the police station and that there was no probable cause for that arrest because it was merely based upon the fact that Aguayo identified him as having been at her house with codefendant on the night in question.[3]

---

[3]Defendant attached an investigative alert to the appendix of his brief to support his argument that he was arrested absent probable cause. We note that attachments to briefs are not properly before this court (*Multiut Corp. v.*

The facts do not support defendant's argument.[4] The record demonstrates, albeit scantily, that defendant voluntarily went to the police station, at least initially. In short order, defendant was interviewed by Detectives Day and Kolman at which time, according to Day, defendant inculpated himself in the victim's murder. Thereafter, defendant allegedly agreed to remain overnight at the police station in order to take a polygraph examination the following morning. There was no evidence presented at trial to dispute the above facts; however, assuming, *arguendo*, for purposes of resolving defendant's argument that he was under arrest when the decision was made that he remain at the police station overnight, defendant had already made an inculpatory statement, such that he acted as a lookout while codefendant shot and killed the victim. Consequently, at that point, there was probable cause for defendant's arrest. See *People v. Morris*, 229 Ill. App. 3d 144, 158 (1992) (probable cause exists when a reasonable person believes the facts and circumstances demonstrate that an offense has been committed and the defendant committed the offense). Accordingly, defense counsel's motion to quash arrest would not have been successful at trial and cannot provide the basis for a successful ineffective assistance claim. See *Rodriguez*, 312 Ill. App. 3d at 925-26.

We further conclude that defendant cannot support his claim of ineffective assistance of counsel for failing to fully litigate the motion to suppress because that motion would not have been successful. Defendant avers that his statement was inadmissible because it was taken after he invoked his rights to counsel and to remain silent. Moreover, defendant maintains that he did not reinitiate the dialogue which led to his statement.

In *People v. Olivera*, 164 Ill. 2d 382 (1995), the supreme court succinctly provided:

> "An accused who has expressed the desire to deal with police only through counsel is not subject to further interrogation by authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police. [Citation.] Even if the accused initiates a conversation that takes place after he has expressed the desire to deal with the police only through counsel, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the fifth amendment right to have counsel present during the interrogation. [Citation.]

*Draiman*, 359 Ill. App. 3d 527, 534 (2005)), and, therefore, the investigative alert will not be considered.

[4]Defendant also repeatedly references the police reports which we previously determined may not be considered by this court.

\*\*\* If the court determines that the accused initiated the conversation in a way evincing a willingness and a desire for a generalized discussion concerning the investigation, it must make one other inquiry in determining whether a defendant has waived his right to the presence of counsel and his right to remain silent during custodial interrogation: whether the accused, by his or her [own] initiation of such a conversation, coupled with the totality of the other circumstances, knowingly and intelligently waived this right. [Citation.]" *Olivera*, 164 Ill. 2d at 389-90.

In the instant case, the facts demonstrate that defendant reinitiated the communication with Detective Kolman and, despite repeated reminders of his rights and numerous opportunities to invoke those rights, defendant continued to discuss his involvement in the offense to Detective Kolman and later to ASA Bischoff. Indeed, according to Detective Kolman, on January 10, 2004, one day after defendant initially arrived at the police station, defendant knocked on the door of the interview room in order to obtain Kolman's attention. Detective Kolman then opened the door and asked defendant what he needed. When defendant simply responded that he wished to speak to him, Detective Kolman asked defendant if he had an attorney, and, if so, had the attorney advised defendant not to speak to the detectives. Because defendant responded yes to both queries, Detective Kolman asked defendant whether, in light of having previously invoked his rights, he still wished to have a conversation. Defendant remained steadfast in his desire to converse even after Kolman readvised him of his *Miranda* rights; therefore, a discussion ensued. Following their brief conversation, defendant further advised Detective Kolman that he wished to speak to an ASA. Consequently, it is clear that defendant both reinitiated the conversation "evincing a willingness and desire for a generalized discussion about the investigation" and knowingly and intelligently, after repeated reminders, waived his rights. Because we find that defendant's statement was admissible, he cannot support a claim of ineffective assistance of counsel on that basis.

We are not persuaded by defendant's attempt to draw parallels between the facts of the instant case and those in *Olivera*. In *Olivera*, the supreme court found that the ambiguous question, "What happened?" posed by the defendant to a detective following his participation in a lineup, did not rise to the level required for reinitiation after a defendant has invoked his fifth amendment rights where that detective answered the defendant absent additional warnings. *Olivera*, 164 Ill. 2d at 390-91. The *Olivera* court distinguished *Oregon v. Bradshaw*, 462 U.S. 1039, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983), where that defendant asked, "Well, what is going to happen to me now?" and the

detective responded, much like Detective Kolman in our case, by reminding the defendant of his rights, stating that, since the defendant had requested an attorney, he should only speak to the detective based on his own free will. *Olivera*, 164 Ill. 2d at 391, citing *Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833. If a parallel is to be drawn, it is between the facts of our case and those of *Bradshaw*, where the Supreme Court concluded that the defendant reinitiated contact. *Bradshaw*, 462 U.S. at 1042, 77 L. Ed. 2d at 410, 103 S. Ct. at 2833. Moreover, we decline defendant's invitation to fashion a new rule requiring that police obtain express authorization from an accused's attorney when it appears that the accused wishes to reinitiate a conversation.

■ Defendant next contends that he was denied his right to a fair trial when the State impermissibly introduced evidence regarding his post-*Miranda* silence in violation of *Doyle* and that his counsel was ineffective for allowing admission of that evidence. The State responds that this argument is waived where trial counsel agreed to the now-challenged language. In the alternative, the State argues that there was no violation because *Doyle* was not implicated.

In *Doyle*, the Supreme Court held that the due process clause generally prohibits the introduction of a defendant's postarrest silence for purposes of impeachment. *Doyle*, 426 U.S. at 619, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245. This court has further stated:

"Illinois also recognizes an impropriety in drawing a negative inference from an accused's exercise of his right to remain silent, both because it impermissibly penalizes the accused for exercising his rights and because an accused's exercise of his right is not inconsistent with a claim of innocence. [Citation.] Further, the principles of *Doyle* apply even if the defendant remains only partially silent after his arrest and even if he does not take the stand at trial." *People v. Bradley*, 192 Ill. App. 3d 387, 391 (1989).

At issue is the reference to defendant having invoked his right to remain silent and to an attorney within his memorialized statement, which was published to the jury as follows:

"[Defendant] met with an attorney *** on January 10th, 2004. He met with the attorney in the afternoon and then told the detectives that he wanted an attorney. Later, on January 10th, [defendant] knocked on the door of his interview room and told the detectives that he wanted to talk to them without an attorney. [Defendant] told Detective Day and Detective Kolman that he wanted to make a statement without his lawyer. After he told the [d]etectives he wanted to talk without a lawyer, Detective Kolman read him his *Miranda* rights again. [Defendant] then made a statement to the detectives.

On January 10th, at 9:45 p.m., [defendant] met with ASA Bischoff who asked him whether he initiated the conversation with the detectives. [Defendant] told ASA Bischoff that he knocked on the interview room door and told the detectives he wanted to make a statement. ASA Bischoff advised him of his rights and [defendant] told ASA Bischoff about the shooting."

Prior to trial, the State raised the issue of the propriety of the contested portion of defendant's statement and the court, with defense counsel's encouragement, determined that the challenged portion was admissible and not a violation of *Doyle* because defendant ultimately chose to speak to the detectives. We agree with that determination.

"*Doyle* applies only when a defendant invokes his right to remain silent." *People v. Patterson*, 217 Ill. 2d 407, 445 (2005). Although it is uncontested that defendant did invoke his right to remain silent at some point, we have also determined that defendant expressly reinitiated the dialogue with Detective Kolman, thus waiving his *Miranda* rights. "Once the right to remain silent has been waived, it can be invoked only by a defendant's positive assertion that he wants to remain silent." *Patterson*, 217 Ill. 2d at 445. The record does not support, and defendant does not contend, that he ever reasserted his right to remain silent. Accordingly, *Doyle* does not apply to the case at bar. As a result, defendant cannot support an ineffective assistance claim on that basis.

■ Defendant further contends that the trial court erred in allowing admission of gang-related evidence. The State responds that defendant has yet again waived review of this argument. In the alternative, the State argues that defendant overstated the character and quantity of the gang reference made at trial and that such evidence was admissible because it was relevant and probative.

We acknowledge that defendant failed to object to this alleged error at trial and has not argued on appeal that his counsel was ineffective for failing to do so; however, defendant did include the challenge in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) (failure to raise an objection both at trial and in a posttrial motion results in waiver). We additionally note that defendant failed to cite to the challenged statement in the record in violation of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). Notwithstanding, we address the merits of defendant's argument. See *Carter*, 208 Ill. 2d at 319 (waiver is a limitation on the parties and not the court).

Defendant argues that the State improperly admitted evidence that he was a member of the Maniac Latin Disciples street gang where there was no evidence that the offense at issue was connected to gang membership. Specifically, defendant takes issue with that portion of

his statement, published to the jury, in which he provided "at the time of the shooting, he feared for his life because if he didn't watch out for [codefendant], the gang might do something real bad to him." In addition, defendant avers that the State improperly remarked on the gang-related evidence in rebuttal argument.

This court has held that "proof of gang membership is relevant and admissible where there is sufficient proof of a relationship between such affiliation and the crime charged, *e.g.*, to show motive or [a] common purpose." *People v. Anderson*, 153 Ill. App. 3d 542, 549 (1987), citing *People v. Hairston*, 46 Ill. 2d 348 (1970). Admission of gang-related evidence will not be reversed absent a demonstration that the trial court abused its discretion. *People v. Casillas*, 195 Ill. 2d 461, 483 (2000).

In the case at bar, we find no error in the admission of defendant's statement. Initially, we note that, contrary to defendant's characterization, the statement at issue did not identify him as a gang member. The statement merely provided that "the gang" might retaliate if he did not obey codefendant. Unlike at the abbreviated suppression hearing, no testimony was admitted regarding defendant's, codefendant's and the victim's gang affiliations and no attempt was made to draw a connection between their affiliation and the victim's murder. Nevertheless, the statement is relevant in that it provided the jury with a motive supporting defendant's reason for assisting codefendant under the circumstances. *Casillas*, 195 Ill. 2d at 482 (gang affiliation is admissible so long as it is relevant). Furthermore, the State's brief remark in rebuttal regarding the challenged portion of defendant's statement was proper where, in closing, defense counsel insinuated that ASA Bischoff manufactured defendant's statement. See *People v. Hopkins*, 363 Ill. App. 3d 971, 987 (2005) (a prosecutor may reply to provocations in rebuttal). Consequently, we find no error.

■ Defendant additionally contends that he was deprived a fair trial as a result of the cumulative errors. More specifically, defendant argues that trial counsel did not subject the State's case to meaningful adversarial testing where he failed to effectively cross-examine the State's witnesses, failed to develop a coherent theory of defense and failed to call codefendant's witness. Defendant further avers that he was denied a fair trial as a result of his counsel's ignorance of the law, as demonstrated by his failure to provide the correct mental state for accountability and rendering incorrect and inconsistent opening and closing remarks. The State responds that defendant impermissibly attempts to circumvent the *Strickland* standard by arguing his counsel's ineffective performance was presumptively prejudicial pursuant to *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039

(1984); however, the record clearly demonstrates that trial counsel provided *some* adversarial testing, even if it was not perfect. Moreover, the State maintains that defendant cannot establish both prongs of the *Strickland* standard for any of his proposed "cumulative errors," the majority of which were matters of trial strategy. We agree.

In *Cronic*, the Supreme Court provided that, in narrow instances where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," ineffectiveness is presumed absent strict application of the *Strickland* standard. *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047. The *Cronic* standard, however, does not apply to the case at bar where review of the record reveals that counsel did subject the State's case to adversarial testing. See *Wright v. Van Patten*, 552 U.S. 120, 125, 169 L. Ed. 2d 583, 588, 128 S. Ct. 743, 746 (2008); (*Cronic* applies when counsel is " 'either totally absent, or prevented from assisting the accused during a critical stage of the proceeding' "), quoting *Cronic*, 466 U.S. at 659 n.25, 80 L. Ed. 2d at 668 n.25, 104 S. Ct. at 2047 n.25. Indeed, defense counsel filed the initial motion to quash and suppress, only withdrawing it after a court recess subsequent to the presentation of the State's witnesses; cross-examined the State's witnesses at trial; filed a motion for a directed verdict; called Detective Day as a defense witness; and presented an opening statement and a closing argument. *Cf. People v. Hattery*, 109 Ill. 2d 449, 458-59 (1985) (counsel presented no evidence; did not make closing arguments; attempted to develop a theory of defense that the defendant was compelled to kill the victims; and conceded that the defendant's confession was truthful).

We further conclude that defendant cannot satisfy the *Strickland* standard with regard to his specified cumulative errors. During his cross-examination of Aguayo, Rosalee and Navarro, defense counsel attempted to establish his theory of defense, namely, that no one saw defendant at the scene of the crime and Aguayo could not accurately identify defendant as the individual that called her home looking for codefendant after the shooting occurred. Moreover, contrary to defendant's recitation of the facts, defense counsel did challenge the veracity of defendant's statement during his cross-examination of ASA Bischoff. Although it is true that defense counsel did not call codefendant's witness, defendant's cursory mention that she "looked at Karlov as shots rang out and saw no-one [*sic*]" fails to provide us with any basis upon which to review whether such an "error" constituted ineffective assistance.[5] See *Negron*, 297 Ill. App. 3d at 537-38.

---

[5]This is an issue that relies on matters outside the record and therefore cannot be reviewed on direct appeal. *O'Brien v. City of Chicago*, 285 Ill. App. 3d 864, 874 (1996).

In addition, we are not persuaded by defendant's argument that defense counsel was inconsistent in his opening and closing remarks; rather, review of the remarks as a whole demonstrates that, although not eloquently stated, defense counsel clearly attempted to focus the jury's attention on the burden of proof and the fact that no one identified defendant at the scene of the crime. On the issue of defense counsel's ignorance of the law as demonstrated by erroneously telling the jury that specific intent was an element of the crime, further review of the record demonstrates that defense counsel was merely attempting to argue that the evidence did not support an accountability conviction based upon the requirements of common design. Nevertheless, the jury was properly instructed at the conclusion of the case; therefore, no error resulted. See *People v. Modrowski*, 296 Ill. App. 3d 735, 743 (1998). Overall, defendant's cumulative "errors" accounted for trial strategies which fell within the wide range of reasonable performance. *Griffin*, 178 Ill. 2d at 86.

Finally, we are not persuaded by defendant's repeated attempts to discredit defense counsel based upon speculation that it was defense counsel's first criminal trial and his law firm did not list criminal defense as one of its specialities. Defendant failed to cite to authority to support his argument in violation of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)). Moreover, although we are confounded as to why defendant fired his respected and experienced initial attorney, a public defender, and then hired his alleged "inexperienced" trial counsel, no finding of ineffective assistance will be found on the bases discussed. "[E]ffective assistance of counsel refers to competent, not perfect, representation." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994).

Defendant also contends that the State failed to prove him guilty beyond a reasonable doubt of first degree murder under the theory of accountability. The State responds that the evidence was sufficient to support defendant's guilt.

When reviewing the sufficiency of the evidence, this court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). It is not this court's function to retry the defendant or substitute our judgment for that of the trier of fact. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Rather, the trier of fact assesses the credibility of the witnesses, determines the appropriate weight of the testimony and resolves conflicts or inconsistencies in the evidence. *Evans*, 209 Ill. 2d at 211. In order to overturn the trial court's judgment, the evidence must be "so

unsatisfactory, improbable or implausible" to raise a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

A defendant is guilty of first degree murder when the State proves beyond a reasonable doubt that, in performing the acts which cause the death of an individual:

"(1) he either intends to kill *** that individual ***, or knows that such acts will cause death to that individual ***; or

(2) he knows that such acts create a strong probability of death *** to that individual ***." 720 ILCS 5/9—1(a)(1), (a)(2) (West 2002).

Further, a defendant will be held legally accountable for the conduct of another when:

"Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 2002).

*People v. Joya*, 319 Ill. App. 3d 370, 381 (2001).

In order to prove that a defendant had the intent to promote or facilitate a crime, the State must establish beyond a reasonable doubt that either: (1) he shared the criminal intent of the principal offender; or (2) there was a common criminal design. *People v. Perez*, 189 Ill. 2d 254, 266 (2000). "Accountability may be established through a person's knowledge of and participation in the criminal scheme, even though there is no evidence that he directly participated in the criminal act itself." *Perez*, 189 Ill. 2d at 267. A defendant's mere presence at the scene of the crime is insufficient to prove accountability, even if the individual has knowledge that a crime is being committed or flees from the scene (*People v. Williams*, 324 Ill. App. 3d 419, 434 (2001)); however, in determining whether a defendant is accountable, the trier of fact may consider: (1) the defendant's presence during the planning of the crime; (2) his presence during the commission of the crime; (3) his flight from the scene; (4) his failure to report the incident; and (5) his continued association with the principal after the commission of the crime. *Perez*, 189 Ill. 2d at 267; see *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). A common purpose or design may be inferred based upon the surrounding circumstances, and words of agreement are not necessary to establish such purpose or design. *Batchelor*, 171 Ill. 2d at 376. Moreover, "[a]cting as a lookout constitutes aiding and abetting in the commission of an offense." *People v. Johnson*, 318 Ill. App. 3d 281, 290 (2000).

■ After reviewing the record, we conclude that there was ample evidence to demonstrate that defendant was accountable for the

victim's first degree murder. Defendant initially accompanied codefendant to Aguayo's house, where codefendant obtained a dark, hooded sweatshirt. Defendant then inquired why they remained in what he described as a "hot" neighborhood, at which time codefendant showed defendant that he was armed with a handgun. Notwithstanding, defendant agreed to walk with codefendant to a bar approximately one block away. At some point, defendant learned that codefendant intended to retrieve money from the victim and, if the money was not repaid, that codefendant planned to shoot the victim. Despite this disclosure, defendant accepted codefendant's cellular telephone with the instructions that defendant was to "watch [codefendant's] back in case the police came" and, in that event, alert codefendant by shouting "yo." Defendant then stood across the street from the bar for up to 25 minutes while codefendant waited for the victim. After the victim appeared and codefendant shot him, defendant moved to a nearby location and waited an additional 30 to 40 minutes before attempting to find codefendant using the provided cellular phone. When codefendant eventually called, the pair met at a designated location at which point codefendant confirmed that he "aired [the victim] out" and defendant returned codefendant's cellular phone. Defendant never alerted the police.

Although, as we stated, mere presence, even combined with knowledge of the crime or flight after the crime, is not enough to support an accountability conviction, the instant defendant knew that codefendant was armed and learned, prior to the shooting, codefendant's intentions, yet remained outside the bar for a significant time after the shooting and then reconnected with codefendant afterward. Furthermore, despite defendant's repeated argument that he never expressly agreed to act as codefendant's lookout, the evidence need not show that he verbally agreed to act as a lookout, especially where the circumstances demonstrated that he acquiesced. See *Batchelor*, 171 Ill. 2d at 376. When defendant took codefendant's cellular telephone, he was given clear instructions to notify codefendant if the police arrived. Defendant accepted the phone; remained on the scene until codefedant safely fled; confirmed that codefendant successfully shot the victim when the pair reconnected; and never reported the incident. See *Perez*, 189 Ill. 2d at 267; see also *Williams*, 324 Ill. App. 3d at 435. We, therefore, conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt where the evidence was not so unsatisfactory, improbable or implausible to raise such a doubt.

Relying on *People v. Estrada*, 243 Ill. App. 3d 177 (1993), defendant argues that he cannot be held liable on a theory of accountability

because he did not know codefendant's plan until they were already outside the bar and there was no evidence to the contrary. In *Estrada,* the court stated that, in order to be convicted based upon a common plan or purpose, the evidence must disclose, "at least by inference, that in addition to being present at the scene of the crime, the accountable party had some advanced knowledge of the criminal plan or scheme." *Estrada,* 243 Ill. App. 3d at 184-85. The *Estrada* court, however, did not define how far in advance the accountable party must be aware of the impending crime, and defendant does not cite, and our research has not revealed, an express time frame. According to defendant's statement, he was aware of codefendant's plan prior to its execution. *Cf. Estrada,* 243 Ill. App. 3d at 185 (no evidence that the defendant was aware the codefendant intended to shoot the victim; rather, the defendant's actions demonstrated that he had no knowledge of the codefendant's plan based upon the fact that he put himself in the line of fire). Moreover, defendant's statement that he acted as a lookout is sufficient to support his conviction. See *Johnson,* 318 Ill. App. 3d at 290.

In sum, we find that defendant received effective assistance of counsel and a fair trial, and that the evidence demonstrated beyond a reasonable doubt that he was accountable for the victim's death. Accordingly, we affirm defendant's conviction.

During oral argument, we noted the length of defendant's sentence and requested that the parties provide supplemental briefs addressing the matter. In accordance therewith, defendant argues that his 45-year sentence was excessive pursuant to his limited involvement in the offense, his minor criminal record and his potential for rehabilitation. The State responds that defendant's sentence was proper.

A trial court is generally considered the best place to determine a defendant's sentence; therefore, we will not disturb that sentence absent an abuse of discretion. *People v. Walker,* 262 Ill. App. 3d 796, 807 (1994). The trial court, however, does not enjoy unfettered discretion; rather, even in instances where the sentence is within the presumptively proper proscribed statutory limitations, "an abuse of discretion may be found where the sentence greatly varies with the purpose and spirit of the law." *People v. Maldonado,* 240 Ill. App. 3d 470, 485 (1992). A sentence must be balanced between the seriousness of the offense and a defendant's rehabilitative potential. *Maldonado,* 240 Ill. App. 3d at 485. Nevertheless, "the trial court is not required to articulate its consideration of mitigating factors [citation] or to make an express finding that the defendant lacked rehabilitative potential [citation]. Nor is the trial court required to accord greater weight to defendant's potential for rehabilitation than to the serious-

ness of the crime." *People v. Boclair*, 225 Ill. App. 3d 331, 335-36 (1992). In order to provide the proper balance, in fashioning its sentence, the trial court must consider:

> "the nature and circumstances of the crime, the defendant's conduct in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." *Maldonado*, 240 Ill. App. 3d at 485-86, citing *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990).

This court has the power, pursuant to Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), to reduce an excessive sentence where the record demonstrates that the trial court abused its discretion. *People v. Clark*, 374 Ill. App. 3d 50, 69 (2007). A reviewing court, however, must be cautious in considering the propriety of a sentence and "must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53-54 (1999), citing *People v. Streit*, 142 Ill. 2d 13, 19 (1991).

■ In the case at bar, defendant was almost 22 years old when he acted as a lookout while codefendant shot and killed the victim. Prior to that time, defendant was a gang member for five years, from the age of 15 until the age of 20. In terms of his criminal record, defendant had one felony drug conviction for which he received one year of probation. Significantly, however, defendant received the felony drug probation just two months prior to committing the instant offense. Moreover, defendant had a number of juvenile convictions, including drug and weapons offenses, for which he also received probation. Defendant, however, also violated his juvenile probation and was incarcerated in a juvenile detention facility. Defendant was forced to withdraw from high school as a result and never returned despite an expressed desire to obtain his GED. Notwithstanding, defendant was raised in a supportive family and has a close relationship with his daughter, who was four years old at the time of sentencing.

Review of the record reveals that the trial court did not abuse its discretion in determining defendant's sentence. The court announced that it considered the presentence investigation report, arguments of counsel in aggravation and mitigation and the requisite statutory framework. The court specified that defendant's sentence resulted from consideration of the facts of the case, including the victim's unprovoked death; his criminal history; his gang participation; his "unremarkable" childhood and supportive family, including his daughter; his inability to obtain steady employment; his propensity to commit future crimes; and the necessity for deterrence.

Although the sentence is substantial, it is within the statutory limits (see 730 ILCS 5/5—8—1(a)(1)(d)(i) (West 2002))[6] and we cannot say that it violates the spirit and purpose of the law. See *Maldonado*, 240 Ill. App. 3d at 485. We acknowledge that defendant's participation in the instant offense was relatively minor, in that he acted as the lookout; however, "[t]he accountability statute (720 ILCS 5/5—2(c) (West 1996)) effectively bars courts from considering the offender's degree of participation in the crime by making all persons who participate in a common criminal design equally responsible." *People v. Miller*, 202 Ill. 2d 328, 340 (2002), citing *People v. Cooper*, 194 Ill. 2d 419, 434-35 (2000) (an exception found where the juvenile defendant's sentence to natural life in prison without the possibility of parole under the multiple-murder sentencing statute was unconscionable under the specific facts of the case); see also *People v. Rodriguez*, 229 Ill. 2d 285, 293 (2008) ("[w]hen a defendant aids or abets another in committing a crime, he is accountable and may be punished for any criminal act, any of his codefendants had done in furtherance of the crime" including being armed with a firearm). Further, defendant has been given more than one chance to rehabilitate himself, yet he has refused those opportunities and continued to participate in criminal activity. Moreover, the trial court was in the best position to determine the appropriate sentence and we will not disturb that sentence merely because we may have weighed factors differently. See *Fern*, 189 Ill. 2d at 54 (rejecting comparative sentencing analysis). Consequently, we find that defendant's sentence was proper.

Accordingly, we affirm the judgment of the circuit court of Cook County.

Affirmed.

QUINN and COLEMAN, JJ., concur.

---

[6]Section 5—8—1(a)(1)(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5—8—1(a)(1)(a) (West 2002)) provides that the range of sentencing for first degree murder is not less than 20 years and not more than 60 years; however, section 5—8—1(a)(1)(d)(i) of the Code (730 ILCS 5/5—8—1(a)(1)(d)(i) (West 2002)) provides a 15-year enhancement when the offense was committed while armed with a firearm.