# Illinois Official Reports

## Appellate Court

*People v. Johnson*, 2014 IL App (1st) 122459-B

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTHONY JOHNSON, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-2459 |
| Filed | December 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for first-degree murder on an accountability theory was reversed, notwithstanding the fact that defendant was the driver in a "drive-by" shooting, since the evidence was insufficient to prove beyond a reasonable doubt that defendant knew the shooter was armed and intended to kill the victim, and that defendant intentionally facilitated the shooter before or during the commission of the offense; furthermore, the court admonished the State about arguments the court found "deeply troubling," including the State's argument comparing defendant to "the Nazis" for denying accountability and the argument that an acquittal would "legalize drive-by shootings." |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04-CR-15600; the Hon. Arthur Hill, Judge, presiding. |
| Judgment | Reversed. |

Counsel on Appeal

Stephen L. Richards, of Law Office of Stephen L. Richards, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant Anthony Johnson was 17 years old on October 1, 2003, when he allegedly drove away from the scene of a shooting with the shooter in his motor vehicle. The shooter was acquitted, but defendant was convicted on October 10, 2007, by a separate jury in a simultaneous trial of first-degree murder on a theory of accountability and sentenced to 30 years in the Illinois Department of Corrections (IDOC). On direct appeal (*People v. Johnson*, No. 1-08-0233 (2010) (unpublished order under Supreme Court Rule 23)), we found that the trial court erred by failing to clarify the accountability statute's use of the word "during" after the jury requested clarification, and we remanded for a new trial. Defendant was convicted on retrial and sentenced to 47 years. *People v. Johnson*, 2013 IL App (1st) 122459. The trial court denied defendant's posttrial motion for a new trial in which defendant argued, among other things, (1) that the State failed to prove him guilty of murder beyond a reasonable doubt; and (2) that the State's remarks at closing argument amounted to prosecutorial misconduct.

¶ 2 Defendant claims on this appeal: (1) that the State's evidence was insufficient to prove defendant accountable beyond a reasonable doubt for Clayton Sims' shooting of Brandon Baity; (2) that the trial court erred by refusing the jury instruction set forth by the appellate court in its prior order concerning the meaning of the word "during" in the accountability statute (720 ILCS 5/5-2(c) (West 2004)); (3) that the trial court erred by overruling the defense's objection to the State's questions of Clayton Sims concerning whether Sims, who did not testify at his own trial, lied by letting his counsel argue that the State failed to prove him guilty beyond a reasonable doubt; (4) that the State committed prosecutorial misconduct with this same line of questioning of Sims; (5) that the prosecutor deprived defendant of a fair trial by arguing in closing that if the jurors acquit, "you might as well legalize drive-by shootings in this town," and that the jurors should not let Clayton Sims lie to another jury; (6) that the prosecutor committed misconduct in closing by comparing defendant to "the Nazis in Nuremburg" by denying accountability; (7) that the prosecutor committed misconduct in closing when he stated falsely to the jury that there were no "useful" bystanders that the State knew of, although a bystander, Alexander Weatherspoon, had testified at defendant's first trial; (8) that defendant's trial counsel erred by failing to call Weatherspoon, who had testified at defendant's first trial that the shooter did not enter a vehicle after the shooting, which would

have corroborated Sims' testimony on this point; and (9) that the increase in defendant's sentence after retrial from 30 years to 47 years was vindictive and we should remand for resentencing or reduce the sentence.

¶ 3 In the first appeal, we concluded that the State's evidence at the first trial "was far from overwhelming." *People v. Johnson*, No. 1-08-0233 (2010) (unpublished order under Supreme Court Rule 23). The State's evidence in the second trial was even less, since an eyewitness from the first trial did not testify at the second trial and the actual shooter, who did not testify at the first trial, testified at the second trial, exonerating the defendant. Thus, we cannot find the State proved defendant accountable for murder beyond a reasonable doubt. For these reasons, we conclude that the State failed to prove beyond a reasonable doubt that defendant was accountable for Sims' murder of Baity, and we reverse defendant's conviction and sentence.

¶ 4 The Illinois Supreme Court subsequently entered a supervisory order directing us to vacate our judgment and reconsider in light of *People v. Fernandez*, 2014 IL 115527, to determine whether a different result was warranted. *People v. Johnson*, No. 117292 (Ill. May 28, 2014). After considering our supreme court's decision in *Fernandez*, we determine that, although *Fernandez* reversed *People v. Phillips*, 2012 IL App (1st) 101923, a case that we previously relied on, a different result is not warranted.

¶ 5                                    BACKGROUND

¶ 6 The State charged 17-year-old Anthony Johnson with first-degree murder for the shooting death of victim Brandon Baity on October 1, 2003. The State's theory was that defendant was accountable for the acts of codefendant Clayton Sims, who shot Baity multiple times. Sims, the shooter, was acquitted by a separate jury while defendant was found guilty by his jury on the theory that he was accountable for Sims' acts.

¶ 7 The State's evidence established that, on the night that Sims shot Baity, defendant was driving around the neighborhood with Nolan Swain, smoking marijuana, drinking liquor and intending to pick up girls. At some point, defendant picked up Sims and they stopped by Baity's vehicle to ask if he had any "weed" for sale. Sims exited the vehicle and shot Baity several times. The detectives who testified at trial to defendant's statements to them admitted that defendant never admitted that he knew Sims was looking for Baity, that Sims had a gun, or that Sims intended to shoot Baity. At the retrial, Sims testified that he told defendant that he wanted to buy some "weed" from Baity and that defendant had no idea what Sims intended to do when he left defendant's vehicle. During the State's closing argument, the prosecutor admitted that the jurors might legitimately ask themselves: "The defendant didn't set out that evening to kill anyone, so what are we doing here?" Although there was some evidence that defendant drove Sims from the scene, Sims testified that he ran away on foot.[1] However, the act of driving someone from the scene is not a ground for finding accountability.[2]

---

[1] Alexander Weatherspoon, the bystander who testified at the first trial, also testified that Sims did not enter the vehicle after the shooting.

[2] *People v. Taylor*, 186 Ill. 2d 439, 448 (1999) ("guilt under accountability is not supported where one merely facilitates the escape"); *People v. Dennis*, 181 Ill. 2d 87, 107 (1998) ("escape is not 'conduct which is an element of an offense' for which defendant may be held accountable" (quoting 720 ILCS 5/5-1 (West 1994))).

- 3 -

¶ 8    The State's evidence at the retrial included the testimony of only one event witness, Nolan Swain, an admitted drug user who was a passenger in the vehicle. Swain testified that he smoked so much marijuana at that time that he would sometimes black out and not remember events; that he was stoned and drunk at the time of the shooting; that he did not recall the shooting or recall hearing gunshots; but that he did recall driving around with defendant and that he woke up once and observed Sims, the shooter, in the vehicle.

¶ 9    The State also called Rufus Johnson, the alleged vehicle owner, who is no relation to defendant and who denied previously telling the police that he had loaned his vehicle to defendant. Both Swain and Johnson testified that they had previously made statements concerning defendant in exchange for the dismissal or reduction of subsequent drug charges.

¶ 10    The State's evidence also included testimony by two detectives about their interviews of defendant. Defendant never provided a statement and was never interviewed until December 4, 2003, a couple of months after the shooting, when police officers approached defendant on the street and transported him to a police station at 8 p.m. Their interviews of defendant began after midnight and lasted through the afternoon of December 5, culminating in defendant's release from custody without charges.

¶ 11    The defense called Sims, who testified that he shot and killed Baity, and that defendant did not know that Sims intended to shoot the victim or that Sims was armed that evening. Sims testified that, during the shooting, defendant drove off and left him at the scene. The jury nonetheless found defendant guilty, and the trial court sentenced him to 47 years in the Illinois Department of Corrections.

¶ 12                    I. Eyewitness Alexander Weatherspoon's Testimony

¶ 13    Since defendant is claiming on appeal that his attorney was ineffective for failing to call bystander Alexander Weatherspoon, we include here a short summary of Weatherspoon's testimony at the first trial, found in our prior order in this case.

¶ 14    At the first trial, Weatherspoon, who was 17 years old at the time of the offense, testified that he was selling marijuana from 7 a.m. on September 30, 2003, until past midnight on October 1, 2003, from the front porch of a building near the intersection of 69th Street and Emerald Avenue in Chicago. Weatherspoon had been selling marijuana at that location for two years prior to the shooting, and Brandon Baity, the victim, supplied the drugs that Weatherspoon sold, while Weatherspoon gave Baity the money from the sales. On the night of the shooting, Baity sat by himself in his vehicle, parked on Emerald Avenue, while Weatherspoon's cousin stood at the intersection at 69th Street as a lookout.

¶ 15    After midnight, Weatherspoon observed a four-door vehicle drive up and stop in the middle of Emerald Avenue, just in front of Baity's vehicle. Weatherspoon assumed that the vehicle contained "a regular customer" since one of the three occupants motioned to Baity that he intended to purchase marijuana. Although Weatherspoon had a clear view of the vehicle, he never observed the face of the driver or the front-seat passenger.

¶ 16    Although Baity made a motion indicating that the vehicle should park, Clayton Sims, whom Weatherspoon had known for two years and identified at trial, exited the vehicle, said something, and then pointed a gun at Weatherspoon. To evade Sims, Weatherspoon ran inside a nearby building, and heard 10 or 12 gunshots as he ran upstairs. He then looked out the second-floor window and observed Baity lying in the street as someone with a gun stood over

him, although Weatherspoon could not make out who the person was. Baity's vehicle had crashed into other vehicles farther down the street, but the vehicle that had previously pulled up with Sims was no longer on the street. Weatherspoon exited the house and walked around the block, and when he returned, Baity was lying in the street alone.

¶ 17                              II. Autopsy, Ballistics, and Other Evidence

¶ 18     The State's first witness at the retrial, Timothy Poland, testified that, in 2003, he was an evidence technician with the Chicago police department. At 2 a.m. on October 1, 2003, he was assigned to process the evidence at the crime scene. Baity's body had already been removed by the time Poland arrived.

¶ 19     Poland observed several crashed vehicles halfway down the block, parked on the east side of the street. Baity's vehicle, an off-white or cream-colored vehicle, had crashed into a blue vehicle, which in turn crashed into the back of another white vehicle. Two of the vehicles, including Baity's, had bullet holes and broken glass. Inside Baity's vehicle, Poland recovered two bullet fragments that appeared to have been fired through the windows. Poland recovered seven bullet shell casings near Baity's vehicle, and four more shell casings further down the block.

¶ 20     Poland testified that a MAC-10,[3] an acronym for "Military Armament Corporation," is a "relatively small weapon," classified as either a "submachine gun" or "machine pistol," and is capable of firing 9-millimeter bullets. A MAC-10 is typically between 4.5 inches and 8 inches long, contains a 1.5-inch-long barrel, and is 2 inches wide. A MAC-10 has a pistol grip, and there are two variations of the gun: (1) a semiautomatic version that is produced for civilians, and (2) a fully automatic version that is produced for police and the military. On a fully automatic setting, a MAC-10 is capable of firing all of its bullets in a second or a second and a half, depending on the size of the magazine, which typically holds 10 to 32 bullets. On a semiautomatic setting, it would take 11 trigger pulls to fire 11 bullets. Poland did not inspect the actual murder weapon since the weapon was never recovered.

¶ 21     Tracy Konior testified that she is a forensic scientist for the Illinois State Police, and she examined 2 fired bullet jacket fragments, 2 lead bullet cores, and 11 9-millimeter bullet cartridge cases that were recovered from the crime scene. Konior opined that the lead cores were unsuitable for comparison, but the jacket fragments were fired from the same gun. Konior also opined that all 11 shell casings were fired from the same gun, but she could not determine whether they were fired from the same gun as the jacket fragments without examining the gun itself. Konior testified that a MAC-10 is a semiautomatic pistol that is eight inches long and shaped similar to a two-by-four with a handle attached to it. The cartridge cases recovered from the crime scene contained a rectangular firing pin, which is commonly used in a MAC-10 or MAC-11 gun, but atypical of most other 9-millimeter pistols.

¶ 22     Dawn Holmes testified that she is a forensic pathologist for the Cook County medical examiner and that she prepared Baity's autopsy report from an autopsy conducted by another pathologist who no longer works for the medical examiner's office. Holmes noted that Baity had several tattoos, including the letter B on his right shoulder. The autopsy revealed that Baity had two apparent bullet wounds–one on each side of his chest–and abrasions on his forehead,

---

[3]Although other witnesses testified about a MAC-10, Sims later testified that he was actually firing a MAC-11, which is a subcompact version of the MAC-10 and a subcompact machine pistol.

nose, and left eyelids. Two bullets were recovered from Baity's body. Holmes opined that the cause of Baity's death was multiple gunshot wounds and that the manner of death was a homicide.

### III. Nolan Swain, Vehicle Passenger

Nolan Swain, a passenger in defendant's vehicle, was interviewed twice by the police. The first interview took place on December 5, 2003, at Area 1 police station. When detectives interviewed him a second time on May 7, 2004, Swain provided a statement to the ASA, which he recanted at trial.

### A. Nolan Swain's Testimony

Nolan Swain testified that he is 26 years old. In 2003, Swain was convicted of possession of a controlled substance with intent to deliver and was sentenced to attend boot camp, where he later obtained his GED. Swain has known defendant since he was a child, and he has known Clayton Sims for eight years. On the evening of September 30, 2003, defendant was driving a gray four-door Pontiac Grand Am, and Swain entered the vehicle and sat in the passenger seat. Swain knew Rufus Johnson but he did not know whether Johnson owned the vehicle. Defendant then drove Swain around the neighborhood with the intention to pick up girls, and the two of them spent the evening smoking marijuana and drinking liquor.

Swain testified that he was so intoxicated that he blacked out in the vehicle. Swain explained he "fell asleep" since he had just finished boot camp and his body did not have much tolerance to drugs at that time. At some point, Swain momentarily regained consciousness and observed Sims in the vehicle, but he did not observe anything else that evening until he awoke the next morning at a "lady's house."

On the evening of December 5, 2003, Chicago police officers transported Swain to the Area 1 police station, where detectives questioned him concerning the September 30, 2003, shooting. Swain did not remember whom he spoke to, or whether he received his *Miranda* warnings. Swain told the detectives that, on September 30, 2003, defendant drove him around the neighborhood in a gray Grand Am, and that he and defendant smoked marijuana and talked to girls. Swain did not recall telling the detectives anything about a shooting that evening, and he instead told them that his night ended when he went to a woman's house and fell asleep, and that he took the L train to Maywood the next day. At some point, Swain's mother arrived at the police station, and Swain was released without charges.

On May 7, 2004, Swain was arrested in a drug sting, in which he and several others were transported to a police station in Homan Square. At the police station, Swain was questioned, but he did not recall whom he spoke to, how many officers he spoke to, or what questions were asked of him. Swain also did not recall speaking with an assistant State's Attorney (ASA) or giving a written statement, but when he was presented with the statement at trial, he testified that he "guesse[d]" that it was a statement that he gave to an ASA. Swain identified his signature that appeared on each page of the statement, after the *Miranda* warnings, and on a photograph of defendant, Clayton Sims, and a man whom he "guessed" was the victim, but he did not "really know him." Swain admitted that he placed his initials on the statement next to handwritten corrections, and he identified a photograph of himself that was made at the time the statement was given, although he did not remember being photographed.

¶ 30        As the State began to question Swain about the substance of the statement, Swain testified that he signed the statement because the police beat him and forced him to sign it. Swain confirmed that his biographical information in the statement was accurate, and he recalled identifying defendant and Sims in photographs and explained to the ASA how he knew them. When questioned specifically about the statement's details concerning the shooting, Swain testified that he again "guess[ed]" that he provided those statements, but he did not recall giving this information to the ASA, and he did not know if the assertions were accurate. The only facts that Swain recalled telling the ASA were that he went to a house with defendant and that he rode the L train to Maywood the next day.

¶ 31        Swain acknowledged that his statement said, in essence, that on September 30, 2003, defendant drove him in a Pontiac Grand Am and that they picked up Clayton Sims at 1:15 a.m. the next morning. As defendant was driving, Swain heard Sims say, "there goes that dude that shot me," and he then observed Baity driving a cream-colored vehicle. At Sims' request, defendant chased the vehicle, which eventually stopped on Emerald Avenue, just short of the intersection at 69th Street. Defendant stopped slightly ahead of Baity's vehicle, and Sims exited the Pontiac. As Sims approached Baity's vehicle on foot, Swain heard a voice say, "dude, want some weed?" Sims then pulled out a MAC-10 gun and shot Baity at least six times. As Sims was shooting, defendant let his foot off the brake and slowly drove his vehicle forward. Baity tried to escape the gunfire but collided with other vehicles as he attempted to drive away. Sims then ran back and entered defendant's vehicle, still holding the gun. Defendant drove away and dropped Sims off at the intersection of 70th Street and Eggleston Avenue.

¶ 32        After the State brought out the substance of the statement, Swain explained that two police officers beat him and forced him to sign the statement. He identified the officers as white, but noted that they were not the same officers that questioned him that evening. The officers did not speak to Swain when they entered the interview room, and instead, they turned the lights off and beat him while he was still handcuffed. The officers punched and kicked Swain, but they did not demand that he sign anything. After the beating, the officers stripped him naked, placed him in a room with the air conditioning turned up, and left him there all night. The beating did not result in any bruising on his body, and he did not tell the ASA about it because he wanted to go home. The police did not beat Swain when he spoke with the ASA, though the ASA advised him to provide false statements. Swain explained, "[S]ome of the stuff [the ASA] told me to make up on my own, say it in my own words. She said how she wanted me to say it and then told me to put it in my own words." Swain admitted that his statement says that no promises or threats were made to him in exchange for the statement, which was made freely and voluntarily.

¶ 33        On cross-examination, Swain admitted that he smoked marijuana nearly every day in 2003, and that he would occasionally black out and not remember things when he smoked too much. Swain again stated that he was high the night of the shooting and that he neither observed Sims with a weapon nor overheard a conversation concerning the victim, Brandon Baity.

¶ 34        Swain also testified that he was taken to three police stations following his May 7, 2004, arrest for conspiracy. Detectives questioned Swain about drugs at first, but they did not find any drugs on his person. The police then told him that he could go home if he told them what they wanted him to say. Swain was in fact charged with a drug offense, but he was immediately

released and was not required to appear in court.

¶ 35                    B. First Interview of Swain, December 5, 2003

¶ 36    Detective Robert Garza testified that he was a Chicago police detective on December 5, 2003, when Detective Edward Winstead asked him to locate Nolan Swain. Garza observed Swain later that day and asked him to accompany him to the Area 1 police station, and Swain agreed. Swain was not under arrest at that time. Garza led Swain to Detective Winstead at the Area 1 police station, and then Garza left. Garza did not work on the case after that day.

¶ 37    Detective Edward Winstead testified that, at the time of trial, he had retired after 35 years with the Chicago police department. On the morning of December 5, 2003, he was assigned to investigate Baity's murder. Winstead asked Garza to locate Swain, and Swain was transported to the police station later that day. Winstead spoke with Swain at 8 p.m. and Swain received his *Miranda* warnings. Swain stated that he did not know anything about the shooting. Soon afterwards, Swain's mother arrived at the police station and told the police that she knew Swain was in defendant's vehicle and that she wanted to speak with him. Winstead allowed her to speak privately with Swain, and when she returned, she said that Swain wanted to tell the truth. After she left, Winstead had a conversation with Swain.

¶ 38    Swain told Winstead that he was standing at the intersection of 68th Street and Eggleston Avenue when defendant drove up in a gray Grand Am. Swain entered the vehicle and defendant drove him around the neighborhood. That evening, the two smoked marijuana and talked to girls. At midnight, defendant picked up Shakia[4] and drove her to her house. Defendant entered her house while Swain drove the vehicle around. Swain did not want to be in the vehicle because he was high, so he honked the horn and waited for defendant. Defendant left the house an hour later, entered the vehicle, and drove off. As defendant drove around the neighborhood, Swain observed Sims at the intersection of 70th Street and Eggleston Avenue. Sims entered the vehicle and sat in the backseat, and Swain fell asleep in the front passenger seat.

¶ 39    Swain woke up to the sound of gunfire. He observed other vehicles in the middle of the street, and Sims was shooting at a cream-colored Mercury that drove forward and hit their vehicle. Defendant then drove down the street, and Sims ran backwards to defendant's vehicle, while still facing the Mercury and firing shots. Sims then entered the vehicle and defendant dropped him off at the intersection of 70th Street and Eggleston Avenue. Defendant then parked the vehicle in an alley near 70th Street and Vincennes Avenue, where defendant and Swain left the vehicle. Swain and defendant met up with Sims, and the three of them walked to a girl's house. Swain fell asleep there, and he rode the L train home the next day.

¶ 40    Swain left the police station after he told Winstead this information and he was not criminally charged.

¶ 41                    C. Second Interview of Swain, May 7, 2004

¶ 42    Detective Chester Bach testified that he has been employed with the Chicago police department for 40 years, and on May 7, 2004, he and his partner, Officer Dave Evans, were assigned to a debriefing at the organized crime division headquarters at Homan Square. During

---

[4]The appellate record does not include a last name for Shakia.

a debriefing, the police typically interview people who are arrested for different offenses to determine if they have any information concerning homicides, shootings, or other violent crimes in the neighborhood where they are arrested. There were many unsolved shootings in 2003 and 2004, and Bach stated that he did not know anything about Baity's murder at that time.

¶ 43　　At 4:30 p.m. that afternoon, Bach interviewed Nolan Swain, who was in custody resulting from the drug sting, in an interview room at the Area 1 police station. Swain received his *Miranda* warnings, and he responded that he understood them. Bach asked Swain if he had any information concerning any murders, shootings, or violent crimes in the area, and Swain said that he did. Bach offered no promises to Swain, and he did not suggest that he would help Swain if he provided information.

¶ 44　　Swain told Bach that he had information concerning a murder. The night of the crime, "Yogi"[5] was driving a gray Pontiac, while Swain sat in the passenger seat and Clayton sat in the backseat. As Yogi was driving, Swain observed a man he knew as "B" driving a beige four-door vehicle. Clayton told Yogi to chase him, and Yogi pursued B's vehicle until he stopped near the intersection of 69th Street and Emerald Avenue. Clayton then exited the Pontiac and shot B, who was still sitting in his vehicle, with a MAC-10 machine gun. Swain did not observe the gun prior to the shooting. Clayton returned to the Pontiac and Yogi dropped him off nearby. Yogi then drove to 71st Street and Vincennes Avenue, where he parked the vehicle and left it. From there, Yogi and Swain walked to another person's home and spent the night. After providing this information, Swain agreed to speak with an ASA.

¶ 45　　Bach then reviewed Baity's murder file for the first time. Afterwards, he notified the felony review unit of the Cook County State Attorney's office and turned the case over to Detectives Brian Lutzow and Minelli.[6] Bach then went off duty. He testified that he never made any promises either to Rufus Johnson or Swain, and that a murder weapon was never recovered in the case. Defendant and Sims were later charged with first-degree murder in June 2004.

¶ 46　　　　　　　　　　　D. Swain's Signed Statement

¶ 47　　Assistant State's Attorney Andreana Turano testified that she arrived at the Area 1 police station before 10 p.m. on May 7, 2004, and spoke with Detectives Lutzow and Minelli. Neither Turano nor the detectives had any familiarity with the Baity case before that day. At 12:10 a.m., Turano and Lutzow spoke with Swain in an office at the police station. Turano introduced herself and read Swain his *Miranda* warnings, and Swain responded that he understood. After a 30- to 40-minute conversation, Swain agreed to provide a statement. Turano requested a statement from Swain because he was also a friend of defendant. Turano spent time alone with Swain, and he never said that the police beat him or left him naked in a cold room. Swain did not appear to have been beaten. Turano told Swain that she was not offering him any promises concerning his drug offense in exchange for his statement.

¶ 48　　Turano and Lutzow then left to speak with Rufus Johnson, and Swain provided a statement when they returned. Swain told Turano and Lutzow what he observed during the night of the shooting, and Turano wrote a summary of what he said. Swain read the summary out loud, and he placed his initials next to any corrections that he made. All three signed it, and Turano

---

[5]"Yogi" is defendant's nickname.

[6]Detective Minelli's first name does not appear in the appellate record.

- 9 -

photographed Swain, which they also signed. At 3:20 a.m., Swain signed the statement that she had written out. At trial, Swain's statement was offered into evidence and then published to the jury as follows:

"Statement of Nolan Swain taken May 8, 2004, at 3:19 a.m [*sic*] at Area 1, Police Headquarters. Present Assistant State's Attorney Andreana Turano Michiels, Detective Brian Lutzow, Star No. 21328. This statement taken regarding the shooting of Brandon Baity which occurred on October 1, 2003, *** at 1:15 a.m. I understand that I have the right to remain silent and that anything I say can be used against me in a court of law. I understand that I have a right to talk to a lawyer and have him present with me during questioning. And if I cannot afford to hire a lawyer, one will be appointed by the court to represent me before any questioning. Understanding these rights I wish to give a statement. After being advised of his constitutional rights and stating that he understood those rights, and also after being advised that Assistant State's Attorney Andreana Turano Michiels is a lawyer and a prosecutor, but not his lawyer, and not a lawyer for anyone else involved in this case, Nolan Swain agreed to give the following statement, which is a summary and not word for word. Nolan Swain states that he is 18 years old. *** Nolan Swain states that he identified the person in People's Exhibit 1 as Yogi. Nolan states that he has known Yogi since he was a young kid. Nolan states that he identified the person in People's Exhibit 2 as Clayton Sims. Nolan states that he has known Clayton for about two or three years and knows Clayton from the neighborhood. Nolan states that he does not know Brandon, but he recognized Brandon as the person Clayton shot and killed on October 1, 2003. Nolan states that on September 3, 2003, he and Yogi were driving around in a gray Grand Am car. Nolan states that the car belonged to Rufus Johnson. Nolan states that he was just chillin' at 70th and Eggleston on September 30, 2003. Nolan states that by chillin' he means that he was just hanging out. Nolan states that Yogi had already gotten the keys to Rufus' car. Nolan states that he and Yogi just drove around in the gray Grand AM [*sic*] car. Nolan states that shortly before 1:15 a.m., on October 1, 2003, he and Yogi picked up Clayton at 70th and Eggleston. Nolan states that Yogi was driving the gray car, and he was sitting in the front seat passenger side. Nolan states that Clayton, who he identified in People's Exhibit 2, got into the back seat of the gray car. Nolan states that they were going to drop off Clayton at the crib. By 'crib' Nolan means that they were going to drop off Clayton at his house. Nolan states that he does not know where Clayton lived at the time. Nolan states that they were on 71st, he heard Clayton loudly state, there goes that dude that shot me. Nolan states that he saw Brandon, who he identified in People's Exhibit 3, driving the cream colored car. Nolan states that Yogi made a right turn and chased after the cream colored car that Brandon was driving. Nolan states that Yogi drove the car to Halsted and then to 69th and then to Emerald. Nolan states that Yogi was driving the car fast, and when they got to *** Emerald, he heard Clayton state, let me out right here. Nolan states that parked at the curb was Brandon in his cream colored car. And Brandon was still seated in the driver's seat. Nolan states that no one else was in Brandon's car. Nolan states that Yogi pulled the car up so that their car was a little bit ahead of Brandon's car. Nolan states that he heard a voice that said something like, Do [*sic*] you want some weed. Nolan states that weed is marijuana. Nolan states that he saw Clayton walk up to the passenger side front of Brandon's car

- 10 -

and open fire. Nolan states that Clayton was firing his gun directly at Brandon. Nolan states that Brandon was still seated in the driver's seat of his car. Nolan states that he did not see Brandon with any weapons. Nolan states that he, Clayton, was firing his gun because he heard the sound of gunshots and saw flashes from the muzzle of Clayton's gun. Nolan states that he heard and saw Clayton fire his gun many times at least over six times. Nolan states that Clayton did not have anything covering his face. Nolan states that Yogi had left his foot off the brake so that their car was inching forward. Nolan states that he heard the sound of tires squealing as he saw Brandon attempting to move his car out of the parking spot and into the street in order to flee from Clayton, who was still firing his gun at Brandon. Nolan states that Brandon's car hit the rear driver's side of the car that Yogi was driving. Nolan states that he then heard loud noises and loud crashing which sounded like Brandon's car was crashing into parked cars. Nolan states that he heard the sounds of glass shattering as well. Nolan states that Clayton had a Mack 10 [*sic*] in his hands as he was firing and as he came back to the car. Nolan states that a Mack 10 [*sic*] is like a semi-automatic machine gun with a big clip. Nolan states that when Clayton got back into the car, he still had the gun in his hands and was placing it near his waist. Nolan states that Yogi drove to 70th and Eggleston where Clayton got out of the car with his gun. Nolan states that Yogi then drove himself, and Yogi to 71st and Vincennes, into the alley where he and Yogi jumped out of the car and left the car there. Nolan states that he then went to a house with Yogi and then took the L or a train subway to Maywood the next day. Nolan states that no threats or promises have been made to him in exchange for giving this statement, and that he is giving this statement freely and voluntarily because it is the truth. Nolan states that he has had a couple of cheese burgers [*sic*] to eat, Pepsi to drink, cigarettes to smoke. And Nolan states that he has been allowed use the restrooms whenever he wanted. Nolan states that he is not under the influence of drugs or alcohol. Nolan states that he has been treated fair by the police and detectives and fair by the state's attorney. Nolan states that he has been arrested on drug charges and no deals or promises have been made to him on that case or any other pending matter in order for him to give this statement. Nolan states that he can read and write English and demonstrated this by reading a loud [*sic*] this entire statement while the detective and [S]tate's [A]ttorney followed along. Nolan states that he was allowed to make any changes, corrections, or additions to the statement that he wanted, and has nothing further to add at this time."

¶ 49                            IV. Rufus Johnson, Vehicle Owner

¶ 50        Rufus Johnson, who is no relation to defendant, provided a statement to the police during an interview with detectives at the Area 1 police station on May 7, 2004. Johnson later testified before a grand jury on May 21, 2004, and he substantially repeated the information that was contained in his prior statement. At trial, Rufus Johnson recanted both his prior statement and grand jury testimony.

¶ 51                            A. Rufus Johnson's Testimony at Trial

¶ 52        Rufus Johnson testified that he was 28 years old at the time of trial. Johnson has known defendant for eight years from the neighborhood, but he knows defendant only by his

- 11 -

nickname, "Yogi." Johnson identified defendant in court. Johnson also knew Swain from the neighborhood. Johnson stated that he knew several people named Clayton, but not with the last name Sims.

¶ 53    Johnson denied owning or having physical possession of any vehicle in September or October 2003, and he denied owning a Chevy Caprice or a gray four-door Pontiac Grand Am, or letting defendant drive any such vehicle.

¶ 54    Johnson testified that he knew a person named Ramon Dill, but Johnson did not possess a vehicle that contained Dill's name on the title. Johnson testified that he does not know what the phrase "pull a move" means, but he admitted that he testified in a prior proceeding that "pulling a move" could mean shooting someone, and that "busting a move" could mean buying drugs or beating someone. Johnson also admitted that he previously testified that the phrase "being strapped" could mean possessing a knife or other weapon.

¶ 55    In September or October 2003, Johnson learned that a shooting had occurred near the intersection of 69th Street and Emerald Avenue three or four days prior to him hearing about it. Johnson denied learning that a person known as "B" was murdered, and he did not know anyone by that nickname.

¶ 56    At the time of trial, Johnson was in custody for contempt of court because he failed to appear in court in this case after receiving a subpoena. Johnson was similarly held in contempt of court in the original trial in 2007 for the same conduct. Johnson admitted to four prior felony drug convictions.

¶ 57    On May 7, 2004, Johnson was arrested as a part of a drug sting, along with Swain, whom Johnson knew as an "associate." Johnson admitted that he was arrested because he was selling drugs, and that he was transported to the police station in Homan Square, where several detectives interviewed him. Johnson did not remember being questioned concerning a prior shooting or murder, and he denied saying anything related to the shooting of Baity. Johnson did not recall being transported to another location and speaking with an ASA, observing photographs, or providing a handwritten statement. He identified himself in a Polaroid photograph and admitted that he signed it.

¶ 58    The State then went through Johnson's statement, and he admitted that his signature appeared on photographs of defendant and Sims. However, Johnson did not recall the ASA writing the statement. Johnson acknowledged that his biographical information on the statement was correct, and he "guess[ed]" that the ASA must have received the information from him, but he does not remember telling the ASA about his background. Johnson identified his signature at the bottom of the first page of the statement, but he testified that all of the assertions contained in the statement concerning him loaning a vehicle to defendant were not true, and that he did not provide this information to the ASA. When asked if he signed the statement, Johnson first testified that it looked like his signature, but that he was not sure since there appeared to be different signatures on each page. Then he admitted that the signatures on the first two pages were his, but on the third page, he stated that the signature appeared to be different, but he nonetheless identified it as his. Johnson identified his signature on pages four and five, but he did not recall signing them. He also did not remember saying anything concerning the police's treatment of him or the voluntariness of his statement.

¶ 59    On May 21, 2004, Johnson was still incarcerated when he testified before a grand jury. He admitted to meeting with an ASA in her office and that she asked him questions concerning the murder of Brandon Baity. The State then went through the transcript of the grand jury

proceedings and asked Johnson if he was asked certain questions and provided certain answers, and Johnson answered "I don't recall" to every question. Johnson later pled guilty to delivery of a controlled substance and was sentenced to four years in the Illinois Department of Corrections.

¶ 60     On cross-examination, Johnson testified that the corner of 69th and Emerald Avenue is a "pot corner," where people frequently purchase marijuana in their vehicles. When asked to further explain what "busting a move" means to him, Johnson stated that the phrase could mean purchasing drugs, beating or shooting a person, or other interpretations based on the context in which the phrase is used.

¶ 61     Johnson also testified that, when he was arrested on May 7, 2004, the police played Johnson audiotapes of himself having conversations about selling drugs, and that he intended to cooperate with the police because he knew that he could receive a lengthy prison sentence if he was convicted on drug conspiracy charges. Johnson served only 14 or 15 months of his original 4-year sentence for delivery of a controlled substance.

¶ 62                    B. May 7, 2004, Interview of Rufus Johnson

¶ 63     Detective Bach testified that, at 2 p.m. on May 7, 2004, he and Detective Evans interviewed Johnson, who was in custody in an interview room as a result of a drug sting. Johnson received his *Miranda* warnings, and the detectives asked him if he had any information concerning any other murders, shootings, or other violent crimes in the area, to which Johnson responded that he did. The detectives did not offer any promises to Johnson in exchange for information, and they did not suggest that they would help him if he cooperated.

¶ 64     Bach testified that Johnson then told them that he let a friend, nicknamed "Yogi," borrow his gray, four-door Pontiac Grand Am on September 30, 2003, and told Yogi that he wanted the vehicle back the next day. Johnson told the detectives that he owned the vehicle, but the title was under the name of Ramon Dill. Yogi never returned the vehicle, so Johnson went looking for him. One week later, Yogi told Johnson that he was driving a person named Clayton, and that Yogi and Clayton "made a move" on a man in another vehicle near the intersection of 69th Street and Emerald Avenue. Clayton told Yogi to chase the man in the vehicle, whom they knew as "B." Yogi chased B's vehicle, and when it crashed, Clayton exited the Pontiac and shot B. Yogi then drove off and parked Johnson's Pontiac somewhere in the area and left it there. Johnson told Yogi that he never wanted to see the vehicle again.

¶ 65     After Johnson provided this information, the detectives asked him if he would be willing to speak to an ASA, and he agreed. Rufus Johnson and Swain were then transported to the Area 1 police station in separate vehicles, and the two did not have contact with each other at any time. At the police station, they were separated into two different interview rooms.

¶ 66                    C. Rufus Johnson's Signed Statement

¶ 67     ASA Turano testified that, later that day, at 10:45 p.m., she and Detective Lutzow spoke with Johnson in an office at the police station. Turano introduced herself to Johnson and explained her role, to which Johnson responded that he understood. After a 30- to 40-minute conversation, Johnson agreed to provide a written statement, and at the time he was coherent and did not have any lapses in his memory. Turano decided to request a written statement from Johnson because he said he was a friend of defendant's, and she was worried that Johnson

might lie later if he spoke with defendant about it. Turano spent some time alone with Johnson, and he stated that he had no complaints about the police and that no threats or promises had been made to him. Turano told Johnson that she was not promising him anything in regard to his drug offense in exchange for his statement.

¶ 68    Turano and Lutzow left Johnson to speak with Swain, and they returned at 12:47 a.m. They spoke about the case again, but this time Turano wrote out a five-page summary of what Johnson said. Johnson read the summary out loud, and he placed his initials next to any corrections that he made. All three signed it, and Turano photographed Johnson, which they also signed. Johnson's statement was offered into evidence and then published to the jury at trial and stated as follows:

"Statement of Rufus Johnson.[7] Taken May 8, 2004 at 12:47 a.m. at Area 1, Police Headquarters. Present, Assistant State's Attorney Andreana Turano Michiels. Detective Brian Lutzow, Star No. 21328. This statement taken regarding the shooting of Brandon Baity, which occurred on October 1, 2003, at *** Emerald at 1:15 a.m. After being advised that Assistant State's Attorney Andreana Turano Michiels is a lawyer and a prosecutor, but not his lawyer, not a lawyer for anyone else involved in this case, Rufus Johnson agreed to give the following statement, which is a summary and not word for word. Rufus Johnson states that he is 20 years old. *** Rufus states that last year in 2003 he owned two cars. Rufus states that in fall of 2003, specifically in September and October 2003, one of the cars he owned was a gray Pontiac Grand Am that had four doors. Rufus states that the name on the title of his car was the name of Ramon Dill, but that he, Rufus, had physical ownership of the car. Rufus states that he identified People's Exhibit 1 as Yogi. Rufus states that Yogi's real name is Anthony Johnson. Rufus states that he has known Yogi for about four years and met through mutual friends. Rufus states that the keys to this gray Grand Am had been lost, and Yogi found the keys to the car in a neighbor's yard. Rufus states that he has another car, a Chevy Caprice wagon that he would use. Rufus states that on September 30th, Yogi told him he had found the keys and wanted to use the gray car. Rufus states that he told Yogi to return the car the next morning, meaning October 1, 2003. Rufus states that on October 1, 2003, his car was not returned to him. Rufus states that he kept trying to contact Yogi to locate his car. Rufus states that at about [sic] a week later he saw Yogi at 70th and Eggleston. Rufus states that he saw Yogi on the sidewalk and asked Yogi where his gray Pontiac Grand Am was. Rufus states that Yogi told him he wasn't going to lie, and that they pulled a move from the car. Rufus states that, pulled a move, means that someone shot someone. Rufus states that Yogi told him that he and Clayton were in the gray car at White Castle at 67th and Halsted. Rufus states that Yogi told him that Yogi and Clayton saw the guy named B by the White Castle. Rufus states that Yogi told him that Clayton was strapped. By strapped, this means that Clayton had a gun on him. Rufus states that Yogi told him that they followed B over to 69th and Emerald. Rufus states that Yogi told him that he, Yogi, was driving the gray car. Rufus states that Yogi told him that when they pulled up next to B, who was in his car, Clayton asked B if he had any weed. By weed, this means marijuana. Rufus states that Yogi told him

_____

[7]Turano never testified that she advised Rufus Johnson of his *Miranda* rights, and Johnson's signed statement does not indicate that he received his *Miranda* warnings.

- 14 -

that Clayton jumped out of the car and started shooting at B. Rufus states that he identified People's Exhibit 2 as Clayton. Rufus states that he knows Clayton from Eggleston, and has known him for about four years. Rufus states that Yogi never said that B had any weapons. Rufus states that Yogi did not state that Clayton had been shot at before. Rufus states that after Yogi told him about the shooting, Rufus states that he told Yogi that it's his car, meaning Rufus did not want the gray car anymore, and Yogi could keep it. Rufus states that he never saw his gray car again. Rufus states that the conversation he had with Yogi about the shooting of B was referring to the shooting that happened on October 1, 2003 at 69th and Emerald. Rufus states that he has not been threatened or promised anything in exchange for giving this statement and that he is giving this statement freely and voluntarily because it is the truth. Rufus states that he has a pending drug charge, but no promises, deals have been made to him on that case or by any other case in order to give this statement. Rufus states that he has been allowed to use the bathroom whenever he needed to. He has had cheese burgers [*sic*] to eat, water and soda to drink, and has cigarettes to smoke. Rufus states that he is not under the influence of any drugs or alcohol. Rufus states that he has been treated fairly well by the police and excellent by the [S]tate's [A]ttorney. Rufus states that he can read and write English and demonstrated this by reading a loud [*sic*] this entire handwritten statement while the [S]tate's [A]ttorney and detective followed along. Rufus states that he was offered to make any changes, corrections or additions to the statement that he wanted, and he had nothing further to add."

¶ 69                                         D. Rufus Johnson's Grand Jury Testimony

¶ 70       Assistant State's Attorney Margaret Ogarek testified that, on May 21, 2004, she spoke with Rufus Johnson for the first time. During a 30-minute conversation, Johnson told Ogarek what he knew about Baity's murder. Ogarek showed Johnson the statement that he provided to Detective Bach earlier that month, and Johnson identified his signatures on the statement. She asked Johnson if the police had mistreated him while he was in custody, and he said they did not. Ogarek asked Johnson if he would testify before a grand jury, and he said yes. She then brought Johnson to the grand jury later that day because she was concerned that he would change his story later since he was a friend of defendant. At trial, Ogarek offered Johnson's grand jury testimony into evidence and published it to the jury.

¶ 71       Johnson testified before the grand jury that he is 20 years old, and that he owned two vehicles in September and October of 2003: a Chevy Caprice and a four-door Pontiac Grand Am. The title to the Pontiac was under the name of Johnson's friend, Ramon Dill, but Johnson had physical ownership of the vehicle.

¶ 72       On September 30, 2003, Johnson knew a person named Anthony, but he did not know his last name and Johnson instead called him by his nickname "Yogi." Johnson had known Yogi for three or four years from the neighborhood, and he identified a photograph of defendant as Yogi. On that day, defendant told Johnson that he found the lost keys to the Pontiac, and he asked Johnson if he could borrow the vehicle. Johnson said yes, but told defendant that he wanted the vehicle back the next morning, and defendant drove off.

¶ 73       Defendant did not return the Pontiac the next day, and when Johnson asked defendant about it, defendant told him that he believed that someone stole the vehicle. Once defendant said this, Johnson immediately left to search for the vehicle, but he did not report it stolen.

¶ 74      Johnson spoke with defendant two or three days later near the intersection of 70th Street and Eggleston Avenue. Johnson again asked defendant where the Pontiac was, and defendant stated, "I can't lie to you anymore. Me and Clayton ended up busting a move," which meant that they shot someone. Johnson had known Clayton for three years, but he did not know Clayton's last name. Defendant told Johnson that, on October 1, 2003, defendant was driving Clayton in the Pontiac near 67th Street and Halsted Street when they observed "B." Johnson did not know B's real name. Defendant said that Clayton had a "unit" or a gun on him. Johnson stated that "strapped" meant that he had a gun. Defendant drove to 69th Street and Emerald Avenue, where he stopped the Pontiac behind B, who was sitting in his own vehicle. Defendant stated that they had followed B there and that they "got on him," meaning that Clayton exited the Pontiac, asked B if he had any marijuana, and then shot him. Clayton returned to the Pontiac and defendant drove away. Defendant never told Johnson that B was armed, and he never told him that Clayton had been shot before. After hearing this information, Johnson told defendant to keep the vehicle because he did not want anything to do with the shooting. Johnson never observed his vehicle again.

¶ 75      Johnson testified before the grand jury that he provided the same account to the ASA and detective at the Area 1 police station, where he signed a handwritten statement. He reviewed the statement with the ASA and signed each page. Johnson testified that no threats or promises were made to him and that he had no complaints concerning his treatment by the police and the ASA. Though Johnson was in custody on a drug offense, he decided to provide the statement to exonerate himself from the shooting. Johnson stated that he did not consume any alcohol or drugs.

¶ 76                              V. Defendant's Statements

¶ 77      On December 5, 2003, defendant was interviewed at the Area 1 police station by Detectives James Las Cola and Anderson[8] at 1 a.m., and then was interviewed a second time over 12 hours later by Detective Winstead at 2:30 p.m. that same day. Defendant never left the police station between interviews, and he was released that day without criminal charges. Defendant never provided a written statement to the police, and he exercised his right not to testify at trial.

¶ 78                        A. First Interview of Defendant, 1 a.m.

¶ 79      Detective Robert Garza testified that he was a detective for the Chicago police on December 4, 2003, when he spoke with defendant on the telephone. Garza told defendant that he had heard that defendant had information about Baity's murder, and defendant replied that he would contact Garza later to tell him about it. That evening, Garza observed defendant, who had not yet called him back, on the street. Garza approached defendant and asked him if he would accompany Garza to the Area 1 police station to speak with detectives, and defendant agreed. At that time, defendant was not in custody, and Garza did not speak to defendant about the case on the way to the police station. Defendant was placed in an interview room at the police station, and Garza informed Detective James Las Cola that defendant had arrived. Garza then left the police station. Garza identified defendant in court.

---

[8]Detective Anderson's first name does not appear in the appellate record.

¶ 80    On cross-examination, Garza testified that he did not remember when he approached defendant on the street, but that it was dark outside. Garza was not in uniform at the time, and defendant cooperated and did not attempt to flee.

¶ 81    Detective James Las Cola testified that Officer Garza transported defendant to the Area 1 police station on December 4, 2003. Las Cola entered the interview room, introduced himself to defendant, and asked him if he needed water or to use the restroom. Las Cola testified that defendant was not under arrest and he was free to leave if he wanted.[9] Las Cola identified defendant in court.

¶ 82    Las Cola testified that, at 1 a.m. the next morning, Las Cola and Detective Anderson led defendant into the viewing side of a lineup room that was furnished with a table and chairs. There, defendant told them that a man named Nolan was driving a vehicle and picked him up at the intersection of 72nd Street and Union Avenue at midnight. Defendant entered the vehicle and sat in the driver's seat. Nolan switched to the passenger seat, and defendant drove the vehicle to the intersection of 70th Street and Eggleston Avenue. There, a man named Clayton entered the vehicle and sat in the backseat. As defendant drove eastbound on 71st Street, he observed a man in a cream-colored Crown Victoria drive past them. Clayton told defendant to follow the vehicle, so defendant turned around and pursued the vehicle, which eventually stopped near the intersection of 69th Street and Emerald Avenue. Defendant drove alongside the vehicle and stopped a little ahead of it.

¶ 83    Las Cola testified that defendant related the following facts: two people emerged from the porch of a nearby house and spoke to the driver of the other vehicle, but they soon walked away toward 69th Street. Clayton then exited the vehicle and approached the passenger side of the Crown Victoria. Clayton raised a gun and fired one time at the driver, but several bullets discharged from the gun. The Crown Victoria hit the rear door of defendant's vehicle, and then drove on the sidewalk and struck another vehicle. Defendant drove down the street while Clayton was still firing at the Crown Victoria, and defendant called to Clayton, "Come at me." Clayton ran back toward defendant's vehicle as defendant drove away, and Clayton continued to shoot at the Crown Victoria as he was running. Clayton caught up to defendant's vehicle and he sat in the backseat. Defendant then drove away, and Clayton told defendant that the driver of the Crown Victoria crawled out the window after he was shot. Defendant then stopped at the intersection of 70th Street and Eggleston Avenue, where Clayton exited the vehicle. Defendant then parked the vehicle in an alley between Lafayette and Vincennes Avenues. Defendant told the detective that the vehicle is now gone. Afterwards, Detective Anderson searched for the vehicle but was unable to locate it.

¶ 84    Las Cola testified that he brought defendant back to the original interview room after defendant provided this information, and Las Cola told defendant that defendant should let Las Cola know if he needed water or use of the restroom. At the time, Las Cola believed there would be a follow-up investigation by the detectives who were coming on duty, and that they would arrest defendant. Las Cola went off duty at 6 or 6:30 a.m. that morning, and defendant was no longer at the police station when he returned at midnight.

¶ 85    On cross-examination, Las Cola testified that the interview room was locked when he first met with defendant. After speaking with defendant in the lineup room, Las Cola thought that

---

[9]There was no testimony that defendant was read his *Miranda* rights at this time.

defendant would be "taken into custody," and that he was under arrest at that point.

¶ 86                                B. Second Interview of Defendant, 2:30 p.m.

¶ 87        Detective Winstead testified that he learned that defendant had arrived at the police station the night before and that he was in custody in an interview room. Winstead had not worked on Baity's murder before that day, so he familiarized himself with the case files. Winstead entered the interview room and introduced himself, and he read defendant his *Miranda* warnings, which defendant responded that he understood. Winstead identified defendant in court.

¶ 88        Winstead then left the police station and drove to the scene of the shooting to look for witnesses. Winstead did not find any new information, so he returned to the station. Winstead brought defendant some food, and defendant ate in a lineup room at 2:30 p.m. in the presence of Winstead, who again read defendant his *Miranda* warnings.

¶ 89        Defendant then told Winstead that, on the day of the shooting, he found the keys to Johnson's gray Grand Am and drove it around. Johnson observed defendant driving the vehicle at noon and told defendant that he could keep the vehicle as long as he did not wreck it.

¶ 90        At 7 p.m. that evening, defendant picked up his friend Nolan Swain, and defendant drove Swain around the neighborhood as they smoked marijuana. At midnight, defendant observed a girl named Shakia, and she entered the vehicle and he drove to her house. Defendant and Shakia went inside her house while Swain drove the vehicle around and repeatedly honked the horn. Defendant eventually left the house and returned to vehicle, and he again drove Swain around the neighborhood.

¶ 91        After midnight, defendant observed Clayton Sims at the intersection of 70th Street and Eggleston Avenue. Sims typically sold marijuana on that street corner, but he had sold all of it before defendant arrived. Sims entered the vehicle so that defendant could drive him home. After dropping off Sims, defendant intended to drive Swain to an L station so that Swain could take the train home. As defendant drove eastbound on 71st Street, he observed a cream-colored Mercury pass his vehicle in the opposite direction. Sims told defendant to follow the Mercury because he wanted to "holler at that guy," so defendant turned around and followed the vehicle.

¶ 92        The Mercury stopped on Emerald Avenue just before 69th Street, and defendant drove in front of the vehicle and stopped as well. Two men emerged from a "dope house" on Emerald Avenue and spoke to the driver of the Mercury. Defendant then called to the two men and asked if they were selling marijuana, and one of them said no. As defendant spoke, Sims exited the vehicle and pulled out a MAC-10 gun, approached the passenger side of the Mercury, and began shooting at the driver. The Mercury drove forward and hit the left rear door of defendant's vehicle, then drove on the curb and hit other vehicles parked on the street.

¶ 93        After the Mercury hit defendant's vehicle, defendant drove five car lengths down the street and stopped. Defendant called to Sims, "Come on or I'm going to leave you." Sims was still firing at the Mercury as he returned to defendant's vehicle. Since the rear driver's side door was damaged, Sims walked around and entered the vehicle on the other side and sat in the backseat. Before Sims entered the vehicle, he said that the driver of the Mercury was attempting to crawl out the driver's side of his vehicle.

¶ 94        Defendant then drove away and dropped off Sims at the intersection of 70th Street and Eggleston Avenue. As Sims exited the vehicle he told defendant, "That's Brandon. Brandon shot me. Brandon don't give a f*** about me, and I don't give a f*** about him." Defendant

then parked the vehicle in an alley near 70th Street and Vincennes Avenue, and he and Swain left it there. Defendant, Swain, and Sims then reconvened and walked to a girl's house nearby, where they stayed for a short while. Sims hid his gun while he was there. Defendant and Sims left the house in a taxi. Sims stayed in the taxi when it dropped defendant off at his girlfriend's house. Defendant's girlfriend was not home, so he walked to another house nearby where a friend of his grandmother lived, and he spent the night there.

¶ 95    The next morning, Sims picked up defendant and drove him to the house where Sims hid the gun. Sims retrieved the gun and they left. Defendant believed that Sims gave the gun to his brother Marcus, who then gave it to a cousin on the west side of Chicago.

¶ 96    Defendant said that he had heard that a man known as "B" had shot Sims a month before. Defendant knew B casually, and described him as a tall, thin man. Defendant stated that the man in the Mercury was not the same "B" that he thought had shot Sims.[10] When defendant first observed the Mercury, he thought that Sims intended to steal the vehicle. Defendant also stated that Sims used a MAC-10 gun with an extended magazine. Although defendant said that he was not afraid of Sims, he did say that he was afraid to drive away and leave Sims at the scene of the shooting because he feared that Sims would seek revenge if he did so. After this conversation, Winstead drove defendant to Emerald Avenue, and defendant showed him where the shooting took place.

¶ 97    Defendant was later released from the police station that night because further investigation was needed on the case. Winstead summarized the information in a memo for other detectives to use, and he did not work on the case after that day.

¶ 98    On cross-examination, Winstead testified that defendant told him that he knew that Sims owned a MAC-10 gun, but defendant did not explain where he learned this information.

¶ 99                              VI. Gunman Clayton Sims' Testimony

¶ 100   The defense's only witness, Clayton Sims, testified that he is 26 years old and is unemployed. After midnight, on October 1, 2003, Sims was standing on Eggleston Avenue, when he observed defendant driving a vehicle. Sims knew defendant that year from the neighborhood since Sims' brother Marcus lived there. Sims identified defendant in court. Defendant stopped his vehicle, and Sims approached and asked for a ride to a nearby destination. Defendant agreed, and Sims entered the vehicle and sat in the backseat behind Swain, who sat in the front passenger seat. That night, Sims was wearing a black hooded sweatshirt, black sweatpants, and a blue jacket.

¶ 101   While defendant was driving, Sims observed Baity driving a vehicle in the same direction as defendant, and Sims told defendant to catch up with Baity so that Sims could get some marijuana from Baity. Defendant drove closer to Baity's vehicle, but he did not do so in a fast and reckless manner. Defendant followed Baity to the intersection of 69th and Emerald Avenue, which is a corner where marijuana is frequently sold to passing motorists.

¶ 102   While they were in the vehicle, Sims did not say anything further to defendant about Baity, and Sims never told defendant or Swain that he intended to shoot Baity. Sims was carrying a MAC-11 pistol tied to a shoestring hanging around his neck, but the gun was underneath his

---

[10]At oral argument before this court, the State said that defendant was "surprised" when Sims shot the actual victim because defendant thought the victim was a different "B."

sweatshirt and he did not reveal it to defendant or Swain while he was in the vehicle. Swain appeared to be asleep the entire time.

¶ 103      Defendant stopped his vehicle in front of Baity, and Sims exited the vehicle. Baity sat in the driver's side of his vehicle, and neither defendant nor Sims said anything to him. Sims testified that there was another person present, but Sims did not identify who this person was or where he or she was located. Sims then removed the gun from underneath his sweatshirt and shot Baity. Sims explained that the shooting was in retaliation since Baity had shot him a few weeks prior. As Sims was shooting, defendant drove off, and Sims realized defendant was gone once Sims stopped firing his gun. Sims did not yell for defendant to stop his vehicle. Sims later stood trial and was found not guilty.

¶ 104      On cross-examination, Sims admitted to shooting and killing Baity. He denied being defendant's friend, but acknowledged that he had known him before the night of the shooting. Sims knew that defendant was charged as accountable for the murder and Sims stated that he chose to testify so that he could show that defendant did not know that Sims intended to shoot Baity that evening. Sims stated that he is an honest and upstanding person, and he testified so that the jurors could know the whole truth. Sims stated that, prior to the shooting, he knew Baity well.

¶ 105      At first, Sims denied using another name in the past, but then admitted that he may have used the alias "Clayton Moss" in 2002, but he was not sure. He also denied using the alias "Darius Moss," and he did not remember providing a false birth date when he was arrested in 2002. He admitted that, in April 2003, he was convicted of aggravated unlawful use of a weapon, and was sentenced to probation. Sims then violated his probation and was sent to boot camp. In August 2005, Sims was convicted of home invasion with a gun. Sims stated that he knew Swain and Rufus Johnson, but he did not know if Rufus Johnson owned the vehicle that defendant was driving.

¶ 106      In 2007, Sims pled not guilty to Baity's murder. In that trial, Sims' lawyer told the jury that Sims did not shoot Baity. Sims admitted that he knows that he cannot be prosecuted again since he was acquitted. Before he testified in defendant's second trial, Sims spoke with a lawyer who advised him that, if he testified, there was nothing that the State could do to him.

¶ 107      The following exchange took place:

         "ASA: You were charged in '04, right?

         SIMS: Yeah.

         ASA: And you being the honest guy you are, pled not guilty, right?

         SIMS: Yeah.

         ASA: Even though you killed Brandon Baity, right?

         SIMS: Yeah.

         ASA: You went to trial, right?

         SIMS: Yeah.

         ASA: You took a jury trial?

         SIMS: Yep.

         ASA: You said earlier you would never do anything to fool jurors, right?

         SIMS: No, you said that. I said–

         ASA: I asked you that and you said no, right?

SIMS: Yeah.

ASA: You would never do anything to lie to jurors, right?

SIMS: No, I mean not–I said not in this situation, no.

ASA: You would never do anything to deceive them, right?

SIMS: No, not in this situation.

ASA: But you always want them to know the whole truth, right?

SIMS: Yep.

ASA: You wouldn't let people lie to them without standing up, would you?

SIMS: Would I let other people lie to them without standing up?

ASA: Yeah?

SIMS: In this situation I'm standing up.

\* \* \*

ASA: At trial–you took a jury trial, right?

SIMS: Yes.

ASA: 2007, right, and you being the guy that would never deceive jurors, your defense at trial was, I didn't do it, right?

SIMS: Yeah. I didn't get on no stand or nothing. It was y'all case.

ASA: You let your lawyer stand up–"

¶ 108 The trial court overruled the defense's objection to this question, and the State finished the question, "You had your lawyer stand up in front of a jury just like this one and say Clayton Sims didn't shoot Brandon Baity, isn't that right?" Sims answered yes. Sims was then further cross-examined as to whether he was "telling the truth" when he allegedly let his own jury believe that he was innocent. The State concluded this line of questioning by asking Sims if he had let Baity's mother "suffer" at his trial by not standing up and telling his jury that he had shot Baity. The defense did not object to these questions.

¶ 109 Sims also testified that his gun was fully automatic, and that he pulled the trigger only once when he fired 13 shots at Baity from a distance of three feet. All the bullets in the magazine had fired on the single trigger pull, and Sims did not fire the gun again. During the shooting, Sims observed Baity's vehicle move, but he did not observe Baity crawl out of the window. Sims admitted that he moved three or four feet while he was shooting. There were no other vehicles on the street when Sims shot Baity.

¶ 110 Sims testified that Baity shot him a few weeks prior to Baity's murder, and that "everybody on Emerald" associated with the 69th Street Black Disciples street gang knew about it. Defendant did not know that Baity had previously shot Sims. Motivated by this shooting, Sims purchased the MAC-11 pistol on the street for $300, and he kept it on his person at all times, but he never showed it to anyone.

¶ 111 Sims reiterated that, on the night of the shooting, he needed a ride to go around the corner, and that he was "strapped," which meant that he had a gun. Defendant and Swain were not his friends. As soon as Sims observed Baity, Sims knew that he intended to kill Baity, and he advised defendant to follow Baity so that Sims could exit the vehicle and shoot him. Sims testified that defendant did not know of his intentions, and that defendant and Swain probably would not have cooperated with Sims if he told them that intended to kill Baity.

- 21 -

¶ 112    On redirect examination, Sims testified that he did not take the stand at his own trial. He did not advise his attorney how to argue his case and his attorney did not ask him.

¶ 113    After Sims' testimony, the defense rested. Defendant exercised his right not to testify at trial.

¶ 114                    VII. Closing, Conviction, and Sentence

¶ 115    During closing argument, the defense stated:

"All [defendant] knew to do was to pull away. And he told Winstead what his problem was at that point and his fear of Mr. Sims with that MAC-10,[11] and his blood thirstiness for retaliation and revenge. That's after-the-fact. For whatever moral obligation he had, it is after-the-fact. It was not before, it was not during. And that is what is required under the instruction you will get. Leaving that scene in the absence of that knowledge, intent, or plan does not make one accountable. Leaving that scene, even with the knowledge that a crime was committed in the absence of the intent, plan, or design does not make one accountable."

¶ 116    The State responded to the defense's argument, stating:

"The defendant says, well even if you believe he drove him away, he might have been afraid and that's why he did it. Well, there's no credible evidence of that to begin with; number 1. Number 2, that's not a defense. Committing first degree murder out of fear of your co-defenders is first degree murder. Being afraid of retribution by your co-offenders is not a defense. That defense didn't work for the Nazis in Nuremburg and it doesn't work for [defendant] today either."

¶ 117    The defense objected to this statement, and the trial court responded to the objection by instructing the jury to listen to the evidence and read the instructions.

¶ 118    The State also told the jury during closing argument:

"Ladies and gentlemen, we are a nation of laws. We elect legislators to go to our state house and our senate and our federal house and our federal senate to enact and to repeal laws. And those laws are our greatest defense against anarchy and chaos. But we need something in addition to the enactment of those laws. We need citizens like yourself to uphold those laws. We need citizens like yourself who are going to say, we're not going to let people come into this courtroom and make a mockery of the criminal justice system. We need citizens who will come together and say we are not going to let the defendant help someone–"

¶ 119    At this point, defense counsel objected, and the trial court overruled the objection. The State then finished the statement, saying, "We are not going to let the defendant help someone else commit cold-blooded murder and get away with it."

¶ 120    During its rebuttal closing argument, the State told the jury that, if defendant's alleged actions did not demonstrate intent to assist Sims murder Baity, "then nothing ever will, and you might as well legalize drive-by shootings in this town."

¶ 121    The State also argued during rebuttal, "[T]here's only three kinds of people at murder scenes; there's victims, there's bystanders, and there's criminals. Brandon Baity is the victim in this case. There's no bystanders that we know of that can tell us anything useful." The

_____

[11]Clayton Sims testified that it was actually a MAC-11.

defense objected, but the trial court did not sustain the objection and responded, "This is argument."

¶ 122     The State concluded its argument by alluding to Sims' prior acquittal, stating, "If the jury in Clayton Sims' case had at their disposal, Clayton Sims telling them he shot Brandon Baity–well if they were here this morning, it would make them sick to their stomach to the verdict they reached in that case." The trial court sustained the defense's objection to this statement, and the State continued, "Because that verdict was a mistake. It was based on a bogus defense and lies and evidence being not revealed." The trial again sustained the defense's objection, and the State continued, "Clayton Sims already duped one jury, let's not make that a trend." The defense did not object to this statement.

¶ 123     In sum, during closing argument, the prosecutor: (1) told the jury that the State knew of no "useful" bystanders to the shooting when the State had presented a bystander as a witness at defendant's first trial; (2) compared defendant to "the Nazis" for denying accountability; (3) argued to the jury that an acquittal would "legalize drive-by shootings in this town"; and (4) made the trial a referendum on Sims, as the admitted killer, who would escape with duping a second jury, rather than focusing on defendant's guilt or innocence.

¶ 124     Defendant requested the trial court to give the instruction, set forth in our prior appellate order, defining the word "during" for the purposes of accountability, and the trial court refused, and the jury found defendant guilty of first-degree murder. At sentencing, the trial court considered factors in aggravation and mitigation, and although defendant was sentenced to 30 years in the IDOC in his first trial, he was sentenced to 47 years on retrial. The trial court reasoned that the additional 17 years was a result of a new aggravating factor: that defendant allegedly assaulted someone in prison, though defendant was not criminally charged for the incident.

¶ 125     Defendant now appeals his conviction and sentence.

¶ 126                                    ANALYSIS

¶ 127     On this appeal, we will first consider defendant's claim that the State's evidence was insufficient to prove defendant accountable beyond a reasonable doubt for the murder of Brandon Baity.

¶ 128     For the reasons discussed below, we reverse defendant's conviction and sentence because the State failed to prove defendant accountable for first-degree murder beyond a reasonable doubt. Since we reverse on this issue, we do not address defendant's other claims of error or decide whether the 17-year increase in defendant's sentence was vindictive.

¶ 129     The evidence in this case was insufficient to support defendant's conviction of first-degree murder. The critical inquiry on review of a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). This standard applies to all criminal cases, " 'regardless of the nature of the evidence.' " *People v. Mocaby*, 378 Ill. App. 3d 1095, 1097 (2008) (quoting *Cunningham*, 212 Ill. 2d at 279). In a challenge to the sufficiency of the evidence, a reviewing court will not retry the defendant, substitute its judgment for that of the trier of fact, or reverse a conviction if any rational trier of fact could have reached the same conclusion based on the evidence viewed in the light most favorable to the prosecution. *People*

*v. Adair*, 406 Ill. App. 3d 133, 137 (2010); *People v. Ross*, 229 Ill. 2d 255, 272 (2008); *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). The function of the reviewing court is to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *Ross*, 229 Ill. 2d at 272. This standard reflects the proposition that it is the jury's function to determine the credibility of witnesses, assign the weight to their testimony, and resolve conflicts in the evidence. *People v. Fountain*, 2011 IL App (1st) 083459-B, ¶ 13 (citing *Ross*, 229 Ill. 2d at 272).

¶ 130    While great deference is given to the findings of the jury, a criminal conviction cannot be upheld if the evidence is so improbable or unsatisfactory as to give rise to a reasonable doubt regarding an essential element of the offense that the defendant has been found guilty of committing. *Adair*, 406 Ill. App. 3d at 137; *People v. Clinton*, 397 Ill. App. 3d 215, 222 (2009); *Mocaby*, 378 Ill. App. 3d at 1097 (if " 'the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt,' " the conviction must be reversed (quoting *People v. Smith*, 185 Ill. 2d 532, 542 (1999))). Reasonable doubt exists as a matter of law when the State fails to prove an essential element of the offense. *Fountain*, 2011 IL App (1st) 083459-B, ¶ 13.

¶ 131    When presented with a challenge to the sufficiency of the evidence, it is this court's function to carefully examine the evidence, giving due consideration to the fact that the court and jury observed and heard the testimony of the witnesses. *People v. Sykes*, 341 Ill. App. 3d 950, 982 (2003). It is the unique responsibility of the jury to weigh the evidence, assess the credibility of the witnesses and to resolve any conflicts in the testimony. *People v. Mejia*, 247 Ill. App. 3d 55, 62 (1993). In fulfilling its duty as the trier of fact, the jury is free to believe as much or as little as it pleases of a witness's testimony. *People v. Beasley*, 54 Ill. App. 3d 109, 114 (1977).

¶ 132    In this case, it was undisputed that Sims was the shooter, and the jury found defendant guilty of first-degree murder solely on a theory of accountability. The Illinois Criminal Code of 1961 provides that a person is accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2004). "[I]t is well settled that, under the Illinois accountability statute, the State may prove a defendant's intent to promote or facilitate an offense by showing either (1) that the defendant shared the criminal intent of the principal, or (2) that there was a common criminal design." (Emphases omitted.) *Fernandez*, 2014 IL 115527, ¶ 21. Consent to the commission of the crime, or mere knowledge of it, is insufficient to constitute aiding or abetting. *People v. Martinez*, 242 Ill. App. 3d 915, 923 (1992). The mere presence of a defendant at the scene of the crime is also insufficient to make a defendant accountable, even if it is coupled with defendant's flight from the scene or defendant's knowledge that a crime has been committed. *People v. Velez*, 388 Ill. App. 3d 493, 512 (2009); *Martinez*, 242 Ill. App. 3d at 923.

¶ 133    In the case at bar, there was neither evidence of a prior intent or advance planning by defendant to transport Sims to shoot the victim, nor was there evidence that defendant participated in a common criminal design; in fact, the evidence showed that defendant did not even know Sims until he entered his vehicle. Sims testified that he never told defendant that he planned to shoot Baity and that defendant did not even know he was armed, and defendant never told the police that he knew that Sims was armed and intended to commit a crime. See

- 24 -

*Taylor*, 186 Ill. 2d at 448 (the defendant was not accountable, although he drove the shooter to and from the scene and although he knew that the shooter had a firearm, where the "defendant neither had knowledge that [the shooter] intended to fire his gun upon exiting the vehicle nor made any effort to aid [the shooter] in the discharge of the weapon"). Additionally, there is no evidence that defendant acted to facilitate the shooting as it occurred since defendant did nothing to assist Sims during the crime.

¶ 134 Furthermore, defendant's presence at the crime scene, his knowledge that a crime had been committed, and any subsequent flight do not amount to accountability. Consent to the commission of the crime, or mere knowledge of it, is insufficient to constitute aiding or abetting. *Martinez*, 242 Ill. App. 3d at 923. The mere presence of a defendant at the scene of the crime is also insufficient to make a defendant accountable, even if it is coupled with defendant's flight from the scene or defendant's knowledge that a crime has been committed. *People v. Velez*, 388 Ill. App. 3d 493, 512 (2009); *Martinez*, 242 Ill. App. 3d at 923.

¶ 135 In our prior order, we concluded that the evidence at defendant's prior trial of accountability was far from overwhelming, and the evidence at his second trial was significantly less. Sims testified at the second trial that he did not tell defendant that he intended to shoot Baity.

¶ 136 The State's evidence at defendant's second trial consisted primarily of the testimony of Nolan Swain, a drug addict who testified that he did not observe the shooting, and detectives' testimony about defendant's statements to the police. The detectives offered no evidence that defendant told them that defendant knew that his passenger was going to shoot the victim.

¶ 137 As we observed on the prior appeal, "[a]lthough a defendant's 'multipage and signed confession' can, by itself, be considered overwhelming evidence" (*Johnson*, No. 1-08-0233, slip op. at 59 (quoting *People v. Spicer*, 379 Ill. App. 3d 441, 458 (2007))), defendant's statements in the case at bar were never read over, corrected for errors, or signed. Even if we were to assume that these statements are accurate, defendant asserted in them that he did not know that there would be a shooting and that he drove Sims away from the scene out of fear that Sims, who was wielding a gun, would exact revenge on him if defendant drove off without him. *Johnson*, No. 1-08-0233, slip op. at 59. This is not enough to convict defendant of the shooting as an accomplice.

¶ 138 Nolan Swain, a drug addict, testified: that he was a passenger in the vehicle driven by defendant; that he was stoned and drunk at the time of the shooting; that he did not recall the shooting or recall hearing gunshots; but that he did recall driving around that night with defendant as they drank alcohol, smoked weed and looked for girls; and that he woke up once and observed Sims in the vehicle.

¶ 139 In addition, Rufus Johnson, the alleged vehicle owner, testified that he was not related to defendant and that he did not loan the vehicle to defendant. Both Swain and Johnson testified that they had previously made false statements to the police in exchange for the dismissal or reduction of subsequent drug charges that were, in fact, dismissed or reduced.

¶ 140 Swain and Johnson both recanted their prior statements and testified that they did not observe the shooting. Neither witness testified that defendant knew that Sims intended to shoot Baity, that defendant knew Sims possessed a gun, or that defendant drove Sims away from the crime scene.

¶ 141     The State argues that Swain's prior statement shows that defendant knew that Sims planned to shoot Baity. In his statement, Swain told the ASA that, as defendant was driving on 71st Street, Sims stated, "there goes that dude that shot me." Defendant then followed the vehicle to 69th Street and Emerald Avenue. Swain stated defendant pulled up a little bit ahead of Baity's vehicle, which then crashed into the rear of defendant's vehicle as Sims began shooting.

¶ 142     Even if Sims did state, "there goes that dude that shot me," this statement is a far cry from showing intent to commit murder and does not prove beyond a reasonable doubt that defendant intended to help Sims shoot the victim. While Swain states that Sims instructed defendant to follow Baity, Swain did not explain why Sims asked defendant to do so, and the evidence in the record raises a reasonable doubt that defendant followed Baity to purchase marijuana. Sims testified that he told defendant that he intended to obtain marijuana from Baity, and that defendant did not know that Sims was armed and planned to shoot Baity. Defendant told Detective Winstead that Sims said he wanted to "holler at that guy" in the cream-colored vehicle, but defendant said that he did not know what Sims planned to do and he did not know Sims was armed. Although defendant initially thought Sims might want to steal the vehicle, defendant asked Baity if he had any marijuana just before the shooting, which corroborates Sims' account. There is nothing in the appellate record to support the accountability theory.

¶ 143     Moreover, Swain describes defendant as stopping his vehicle a little bit ahead of Baity's vehicle, positioning it in a manner which may have blocked Baity's escape route, but there is nothing in Swain's statement that indicates that defendant purposefully stopped there to box in Baity's vehicle to commit a murder. In fact, there is no evidence that defendant positioned his vehicle in some unusual manner or pinned Baity in his parking space, other than merely stopping his vehicle in the street. In any event, Swain stated that, once Sims started shooting, Baity's vehicle collided with defendant's vehicle, and that defendant actually drove further down the street away from the initial stopping spot. Furthermore, Johnson's statement indicates that defendant told him that he stopped the vehicle *behind* Baity, not in front. As a result, Swain's statement does not prove beyond a reasonable doubt that defendant knew of Sims' intent to shoot Baity, or that he purposefully acted in furtherance of those plans.

¶ 144     The State argues that Rufus Johnson's prior statement supports the guilty verdict since he stated that defendant stated, after the murder, that he followed "B" and Sims was "strapped." The State argues that Johnson's statement that defendant said that they "busted a move" and "got on [Baity]" prove that defendant helped Sims commit the murder.

¶ 145     However, defendant's secondhand statements are merely an after-the-fact account of the events that had already taken place the night of the murder, and it is impossible to tell from them what defendant's intentions were prior to the shooting. The statement that defendant observed B driving past him does not indicate whether defendant identified B as the driver at that moment in time, or if he later learned that B was the driver from Sims. Defendant later told Detective Winstead that Sims identified the victim after the shooting, but defendant still did not recognize the victim and thought it was a different "B." Even if defendant immediately identified the driver as "B," Johnson's statement does not offer a motive for why defendant followed him. As stated, there is evidence in the record to suggest that Sims wanted to obtain marijuana from Baity, but there is nothing to indicate that defendant followed Baity to assist in Sims' murder.

¶ 146    Also, Rufus Johnson's recanted statement does not indicate when defendant learned that Sims was armed. According to Johnson's statement, defendant told Johnson after the murder that Sims had a unit or gun on him, and that Sims was "strapped," which meant that he was armed with a gun. However, Johnson's statement does not reveal that defendant explained how or when he learned of this fact. Sims testified that defendant did not know that he was armed, and both defendant and Swain told detectives that they did not observe the gun until Sims started shooting. It is undisputed that Sims was in fact armed that night, which became apparent when he shot and killed Baity. Although defendant may have related this fact to Johnson afterwards, defendant did not say whether he knew Sims had a gun prior to the murder, and there is no evidence that he knew about the gun, plan, or the shooting.

¶ 147    Furthermore, defendant's statements that they "got on [Baity]" and "pulled a move from the car" are far too ambiguous to convict defendant on the theory of accountability. In his grand jury testimony, Johnson testified that the phrase "got on him" meant that they pulled up and Clayton exited the vehicle and asked B whether he had any weed and started firing his gun, and jumped back in the car and they pulled off. In his prior statement to the police, Johnson said that "pulled a move" meant that "someone shot someone." At trial, however, Johnson recanted his prior statement and grand jury testimony, and he testified that "busting a move" could mean purchasing drugs, beating or shooting a person, or other interpretations based on the context in which the phrase is used.

¶ 148    Even if defendant's postevent statements, as related by Rufus Johnson, were unambiguous, they do not prove that defendant aided and abetted Sims before or during the commission of the crime. As far as the State's argument that defendant was taking credit for participating in the murders, the statements do not suggest that defendant intentionally assisted Sims until he drove him away after the offense was complete. Although driving the shooter away from a murder assists the shooter in avoiding capture, that conduct in itself does not hold the driver legally accountable for murder. *Taylor*, 186 Ill. 2d at 448; *Dennis*, 181 Ill. 2d at 107. That offense is accessory after the fact (720 ILCS 5/31-5 (West 2002)), not first-degree murder. Johnson's statement is not evidence that defendant was accountable for murder.

¶ 149    The State argues that defendant's statements are evidence that he aided Sims during the shooting since he told Sims to enter the vehicle and then drove him away. Detective Las Cola testified that defendant told him that he drove down the block as Sims was shooting, and he called to Sims, "Come at me." While still shooting, Sims ran back to defendant's vehicle. Sims then sat in the backseat and defendant drove away. Detective Winstead testified that defendant told him that, as Sims was shooting, he drove five car lengths down the street, stopped, and yelled for Sims, "Come on or I'm going to leave you." Sims then ran backwards to defendant's vehicle while still firing his gun, entered the backseat, and defendant drove away. However, after interviewing defendant, Winstead released defendant without charges. Yet, the State argues that defendant's statement shows that he was aiding the murder as it happened.

¶ 150    First, we note there is a question whether defendant actually urged Sims to return to the vehicle. Neither Swain's nor Johnson's recanted statements detail this fact, and Sims testified at trial that defendant drove off without warning and left him there.

¶ 151    Second, even if defendant did in fact stop and beckon Sims to return to the vehicle, this statement alone does not amount to accountability for murder because its meaning is ambiguous as to whether defendant intentionally aided and abetted Sims prior to or during the shooting. Defendant's statement, "Come on or I'm going to leave you," does not show a

common design or plan for murder, and at face value suggests that defendant merely urged Sims to stop shooting and to return to the vehicle. As stated, there is no evidence that, prior to the shooting, defendant knew that Sims intended to shoot the victim, and defendant told detectives that he did not know Sims was armed or what he planned to do. In this context, defendant was surprised that Sims began shooting Baity, and defendant's call for Sims to return to the vehicle may be just as easily construed as a demand to stop shooting and leave with him. In fact, defendant told Winstead that he stopped driving and urged Sims to return to his vehicle solely because he was afraid of revenge, not because he intended to assist Sims murder the victim. As a result, the State has failed to prove beyond a reasonable doubt that defendant intended to facilitate the murder either before or during the shooting.

¶ 152     The State also argues that there are several factors that we should consider to determine if defendant is legally responsible for murder. These factors include: (1) defendant's presence during the commission of the offense; (2) defendant's flight from the crime scene; (3) defendant's failure to report the incident to the police; and (4) defendant's affiliation with his companions after the commission of the crime. *People v. Reid*, 136 Ill. 2d 27, 62 (1990). The State maintains that all of these factors are present. However, these individual factors are not required for a finding of accountability and are instead used as considerations. *Martinez*, 242 Ill. App. 3d at 924.

¶ 153     Despite the State's claim that defendant did not report the shooting to the police, we note that defendant voluntarily accompanied Detective Garza to the Area 1 police station and spoke with Detectives Las Cola and Winstead about the shooting, even though he was not under arrest. Such conduct by defendant shows a lack of a guilty mind, and thus factor (3) actually cuts in defendant's favor.

¶ 154     As for factors (1) and (2), the fact that defendant was present at the shooting and did not stop it from happening, and later drove defendant away does not amount to accountability. *Martinez*, 242 Ill. App. 3d at 923; *Velez*, 388 Ill. App. 3d at 512 (the mere presence of a defendant at the scene of the crime is also insufficient to make a defendant accountable, even if it is coupled with defendant's flight from the scene or defendant's knowledge that a crime has been committed).

¶ 155     The State points to our supreme court's application of these factors in *People v. Taylor*, 164 Ill. 2d 131, 140-41 (1995) (*Taylor I*). In that case, the defendant's murder conviction was affirmed on the basis of accountability, even though he was unarmed and did not participate in the planning or execution of any plan to murder the victim or provide any instruments in furtherance of that plan. *Taylor I*, 164 Ill. 2d at 141. In applying the factors cited from *Reid*, the Illinois Supreme Court observed that the defendant: (1) was present during the offense, approved of the offense, and failed to prevent it from occurring; (2) fled the crime scene after the murder; (3) did not report the crime to the police; and (4) maintained a close affiliation with the shooter after the commission of the crime when he accompanied the shooter to retrieve a new weapon. *Taylor I*, 164 Ill. 2d at 142-43.

¶ 156     However, *Taylor I* is distinguishable because, in that case, the defendant knew that the shooter was armed and intended to kill the victim and that the shooter was instructed on where to locate the victim, and after the shooting, the defendant accompanied the shooter to obtain another weapon. *Taylor I*, 164 Ill. 2d at 142. While there was conflicting testimony at trial, our supreme court held that it was the responsibility of the trier of fact to resolve any conflicting testimony. *Taylor I*, 164 Ill. 2d at 142. In the case at bar, there is *no* evidence that defendant

- 28 -

knew the shooter was armed and planned to murder the victim, or that defendant intentionally and knowingly acted to facilitate the murder.

¶ 157    This case is more similar to the recent decision in *People v. Taylor*, 186 Ill. 2d 439 (1999) (*Taylor II*). In that case, the defendant was driving an automobile when his passenger showed him that he was carrying a gun. *Taylor II*, 186 Ill. 2d at 442. Later, the defendant nearly collided with another vehicle, although the accounts of how this happened were disputed. *Taylor II*, 186 Ill. 2d at 442-43. As the occupants of the other vehicle exited to check for damage, a heated exchange occurred between them and the defendant's passenger, who then exited the vehicle and fired his gun at the other vehicle. *Taylor II*, 186 Ill. 2d at 443. The defendant's passenger then reentered the vehicle and the defendant drove them away. *Taylor II*, 186 Ill. 2d at 443. At trial, the defendant testified that his passenger never told him why he wanted the defendant to stop the vehicle, nor did he give the defendant any reason for exiting the vehicle or firing his gun. *Taylor II*, 186 Ill. 2d at 443-44. The defendant was subsequently convicted with aggravated discharge of a firearm based on a theory of accountability, and the appellate court affirmed. *Taylor II*, 186 Ill. 2d at 444. Our supreme court reversed the defendant's conviction, finding that there was insufficient evidence to support a conviction on the theory of accountability since the defendant stopped the vehicle upon his passenger's request and there is no evidence that the defendant had knowledge of his passenger's intentions upon exiting the vehicle. *Taylor II*, 186 Ill. 2d at 447. Even though the defendant knew his passenger had a gun, he did not know his passenger intended to shoot the victims, and the defendant's actions since the shooting began were merely directed at effectuating an escape and not at promoting the commission of a crime. *Taylor II*, 186 Ill. 2d at 447.

¶ 158    The facts in the instant case are similar since defendant similarly stopped the vehicle at Sims' request and there is no evidence that defendant knew of Sims' true intentions when he exited the vehicle, or even that he had a gun. Furthermore, defendant did nothing to facilitate the commission of the crime once Sims started shooting, and defendant's actions were merely directed at driving away from the crime. There is also even less evidence of accountability in this case than in *Taylor II* since there is also no evidence that defendant knew that Sims was armed. As a result, the State has failed to prove beyond a reasonable doubt that defendant is accountable for Sims' murder of Baity, and we reverse his conviction and sentence.

¶ 159    We also note that the Illinois Supreme Court subsequently entered a supervisory order directing us to vacate our judgment and reconsider our opinion in light of *Fernandez*, 2014 IL 115527, to determine whether a different result was warranted. *People v. Johnson*, No. 117292 (Ill. May 28, 2014) (supervisory order). After considering our supreme court's decision in *Fernandez*, we determine that, although *Fernandez* reversed *Phillips*, 2012 IL App (1st) 101923, a case that we previously relied on, a different result is not warranted. In *Phillips*, the defendant was driving his vehicle when he nearly collided with another vehicle that was making a U-turn. *Phillips*, 2012 IL App (1st) 101923, ¶ 3. As the two vehicles stopped and faced each other, each blocking each other from proceeding straight down the street, the codefendant exited the defendant's vehicle and shot at the other vehicle. *Phillips*, 2012 IL App (1st) 101923, ¶ 5. The codefendant then reentered the vehicle and the defendant drove away. *Phillips*, 2012 IL App (1st) 101923, ¶ 6. The trial court convicted the defendant of aggravated battery with a firearm and aggravated discharge of a firearm on a theory of accountability. *Phillips*, 2012 IL App (1st) 101923, ¶ 8. On appeal, the appellate court reversed the defendant's conviction, finding that the State did not prove that the defendant knew prior to the

shooting that the codefendant was armed and planned to shoot the victims. *Phillips*, 2012 IL App (1st) 101923, ¶ 21.

¶ 160    In reversing the defendant's conviction, the *Phillips* court found that a defendant may *never* be held accountable for a crime that he did not specifically intend to promote or facilitate, stating that: "Even if we were to assume that defendant intended to help [the codefendant] commit some crime against the victims, he cannot logically have intended to help [the codefendant] commit a crime that he does not know is possible. If defendant did not know that [the codefendant] had a gun, then regardless of what else defendant may have done he cannot have intended to help [the codefendant] commit a crime that necessarily requires a firearm, and he therefore cannot be accountable for it." *Phillips*, 2012 IL App (1st) 101923, ¶ 22. However, our supreme court in *Fernandez* found that this rule set forth in *Phillips* is an erroneous characterization of the law since it conflates two distinct accountability schemes. *Fernandez*, 2014 IL 115527, ¶ 21. Our supreme court found that, in accountability cases that involved the shared intent of the defendant, courts may focus on what the defendant knew about their passengers' criminal intentions, since one cannot share an intent to promote or facilitate the commission of a crime when one doesn't even know that a crime is going to be committed. *Fernandez*, 2014 IL 115527, ¶ 21. By contrast, in accountability cases based on common design, a defendant is accountable where he intentionally sets out to promote or facilitate the commission of a crime, including any criminal act done in furtherance of the planned and intended act. *Fernandez*, 2014 IL 115527, ¶ 21. "In other words, there is no question that one can be held accountable for a crime other than the one that was planned or intended, provided it was committed in furtherance of the crime that *was* planned or intended. To the extent that *Phillips* holds or suggests otherwise, it is hereby overruled." (Emphasis in original.) *Fernandez*, 2014 IL 115527, ¶ 19.

¶ 161    However, *Fernandez* does not warrant a different outcome in this case since there is no evidence to find defendant accountable under either the rule of shared intent or the rule of common design. Here, there was no evidence of a prior intent or advance planning by defendant to transport Sims to shoot Baity. Sims testified that he never told defendant that he planned to shoot Baity and that defendant did not even know he was armed, and defendant never told the police that he knew that Sims was armed and intended to commit a crime. Additionally, there was no evidence that defendant participated in a common criminal design or acted to facilitate the shooting as it occurred since defendant did nothing to assist Sims during the crime. As a result, we reverse defendant's conviction and sentence because the State has failed to prove beyond a reasonable doubt that defendant is accountable for Sims' murder of Baity. The State failed to offer any evidence to show that defendant was in any way involved in the commission of any crime.

¶ 162    As a final matter, we note that the evidence at retrial was so lacking that a subsequent retrial of defendant would violate his constitutional right against double jeopardy. " 'The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.' " *People v. Taylor*, 76 Ill. 2d 289, 309 (1979) (quoting *Burks v. United States*, 437 U.S. 1, 11 (1978)). Since the evidence at retrial was insufficient for a finding of accountability, defendant may not be tried for Baity's murder a third time.

¶ 163    Since we are reversing defendant's conviction, we need not address defendant's other claims or his claim concerning sentencing.

¶ 164                                CONCLUSION

¶ 165    We reverse defendant's first-degree murder conviction. Although defendant drove the shooter to and from the crime scene, the State has failed to prove beyond a reasonable doubt that defendant knew that the shooter was armed and intended to murder the victim. Since the State failed to prove beyond a reasonable doubt that defendant intentionally facilitated the shooter before or during the commission of the offense, the State failed to prove defendant accountable for first-degree murder beyond a reasonable doubt, and we reverse defendant's conviction and sentence.

¶ 166    We do find deeply troubling the fact: (1) that the State in closing made the trial a referendum on Sims, the admitted killer, and whether he would escape with duping a second jury, rather than on defendant's guilt or innocence; (2) that the State argued that an acquittal would "legalize drive-by shootings in this town"; and (3) that the State compared defendant to "the Nazis" for denying accountability. The State inflamed the passions and prejudices of the jury when it compared defendant to the Nazis, and claimed that his defense was no different than those who were tried in Nuremberg for crimes against humanity. In all of history, there was hardly a more heinous group than the Nazis. By invoking the Nuremberg trials of Nazis, the State drew a comparison between defendant and war criminals that were tried for the worst atrocities in modern human history. This type of conduct has no place in the courtroom. We want to emphasize that this is not conduct we would want to see again.

¶ 167    Reversed.